# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

| | |
|---|---|
| UPSTATE HOLDINGS, LLC<br>Plaintiff,<br><br>V.<br>1.  DAVID J. HEIL, individually,<br>2.  DHV VENTURES, LLC,<br>3.  JAMES WAIT, individually,<br>4.  STATE STORAGE GROUP, LLC,<br>5.  ANG EQUITY HOLDINGS, LLC,<br>6.  NICK GOOD, individually,<br>7.  TEXAS BUILT, LLC,<br>8.  STATE STORAGE PALMETTO, LLC,<br>9.  STATE STORAGE TAMPA BAY, LLC,<br>10. STATE STORAGE SOUTHWEST, LLC,<br>11. UTAH BUILT, LLC,<br>12. DAVID W. HEIL, individually,<br>13. CARL GENTILE, individually,<br>14. JUSTIN COHEN, individually,<br>15. CGV HOLDINGS, LLC,<br>16. COHEN CAPITAL, LLC,<br>17. GATOR STATE STORAGE WPB, LLC,<br>18. GATOR STATE STORAGE HAVERHILL, LLC,<br>19. GATOR STATE STORAGE LAKE WORTH, LLC,<br>20. GATOR STATE STORAGE BOYNTON BEACH, LLC, | Docket No. _____<br><br><br><br>**COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

1

21. ABEL SNG, individually,

22. JOHN DOE 1-10 (Unknown individuals who participated in the fraudulent transactions and enterprise)

23. DOE ENTITY 1-10 (Unknown limited liability companies or other business entities that participated in the fraudulent transactions and enterprise)

Defendants.

---

## I.  <u>PRELIMINARY STATEMENT</u>

This action arises from an ongoing racketeering scheme orchestrated by David J. Heil, acting primarily through but not limited to State Storage Group, LLC, DHV Ventures, LLC, and a network of affiliated entities, to continually defraud Plaintiff of his rightful equity, profits, and economic interests in a series of jointly owned real estate ventures across Florida and Texas. With the willing assistance of James Wait and other co-conspirators, David J.Heil systematically stripped Plaintiff of his ownership benefits by diverting millions in property proceeds through self-dealing loans, concealing material financial activity, falsifying records, and executing structured interstate wire transfers designed to evade detection. These actions are part of an ongoing deliberate scheme to eliminate Plaintiff's participation and deceitfully seize full financial control for the Defendants' personal enrichment.

This action does not arise from a failed business venture or an ordinary breach of contract. It arises from a deliberate racketeering scheme involving independent criminal acts including wire

fraud, bank fraud, money laundering, extortion, and obstruction of justice, executed through interstate communications and a web of affiliated entities. The Defendants' conduct reflects a sustained criminal enterprise designed to misappropriate assets, conceal proceeds, and permanently divest Plaintiff of ownership, control, and lawful economic interests. Since at least 2019, Defendants have engaged in a coordinated, interstate enterprise to misappropriate assets and conceal their actions through predicate acts of wire fraud, money laundering, bank fraud, and extortion, including the use of coercive threats to seize Plaintiff's business assets unless a monetary settlement was paid. These acts also included the repeated submission of false statements to financial institutions regarding pending litigation, property values, and property ownership. The specific predicate acts attributable to each Defendant, including dates, transactions, and interstate communications, are set forth in Appendix A, attached hereto and incorporated herein by reference as if fully set forth. These actions were designed not only to deprive Plaintiff of financial rights, but also to deceive lenders and regulators across multiple states.

The unlawful scheme expanded further in 2022 and 2023, when Defendants used insider controlled entities to acquire two commercial self storage properties in Utah, known as Cedar City Shops and Cedar City Storage. These acquisitions were funded in part by at least seven figure amounts in enterprise funds unlawfully diverted from Plaintiff controlled accounts through insider transactions initiated by State Storage Palmetto, LLC. The use of these misappropriated funds was never disclosed to Plaintiff and occurred without his consent. Based on loan records and lender representations, the Utah properties now hold substantial equity derived in part from misappropriated enterprise funds. The insider loan used to finance the transaction has since matured and remains unpaid, further confirming its illegitimate nature and the enterprise's intent

to launder and convert stolen assets. Plaintiff was excluded from all ownership or profit participation despite his rightful interest in the capital used to finance the acquisitions.

The same scheme was employed contemporaneously with respect to multiple Florida based self storage properties acquired or stabilized through insider controlled entities, including facilities in Boynton Beach, Haverhill, and Lake Worth, Florida. Prior to the sale of State Storage Palmetto, LLC's sole asset, Defendants caused these Florida entities to acquire properties using bridge or substitute financing obtained through affiliated shell entities, with the premeditated intent to later retire, refinance, or stabilize those assets using diverted Palmetto proceeds. Upon receipt of the Palmetto sale funds, Defendants transferred enterprise capital to these Florida entities the same day to repay insider debt and entrench control, while excluding Plaintiff from approval, disclosure, distributions, and any resulting equity. This coordinated use of interim financing followed by the diversion of enterprise proceeds reflects a deliberate and repeatable laundering mechanism designed to convert Plaintiff's ownership interests into assets held exclusively for Defendants' benefit.

Heil further obstructed justice by providing materially false sworn testimony under oath in arbitration and other judicial proceedings concerning asset valuations, ownership interests, and financial control. These false statements, including direct contradictions under oath, were made to conceal the enterprise's misconduct and frustrate Plaintiff's recovery efforts. In furtherance of this obstruction, Heil also caused Plaintiff's enterprise email account and related internal communications to be deleted during the same period in which disputes had escalated and litigation was reasonably foreseeable, eliminating records that documented budgets, asset control, and financial decision making. Evidence of these false sworn statements and the destruction of internal records will be presented at trial. Together, these acts were designed to

mislead legal authorities, suppress material evidence, and intentionally deprive Plaintiff of the ability to lawfully recover misappropriated assets.

The racketeering scheme continues to this day, with Defendants continuing to maintain unlawful control over proceeds, concealing corporate records, and executing additional transactions designed to frustrate recovery efforts. Plaintiff now seeks full relief under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(a)–(d), including compensatory and treble damages, injunctive relief, and a full forensic accounting.

## II.    PARTIES

1.    Plaintiff, who is located at 801 West Bay Dr Suite 454 Largo FL 33770 brings this civil action under 18 U.S.C. §§ 1962(a), (b), (c), and (d), alleging that Defendants have engaged and continue to engage in a racketeering scheme beginning in 2019 and persisting through the present, constituting a criminal enterprise under federal law.

2.    Defendant 1: David J. Heil (Heil) is an individual who, at all relevant times, owned and controlled multiple business entities central to the racketeering enterprise, including but not limited to State Storage Group, LLC and DHV Ventures, LLC. Heil personally directed and authorized the diversion of company proceeds, coordinated insider transactions, and executed documents that facilitated fraudulent transfers, false representations, and the concealment of assets. His conduct forms the foundation of multiple predicate acts, including wire fraud, bank fraud, obstruction of justice, and conspiracy, and he is personally liable under 18 U.S.C. §§ 1962(a)–(d). Defendant David J. Heil is referred to throughout this Complaint as 'Heil.' References to 'Heil' do not include Defendant David W. Heil unless expressly stated.

3.    Defendant 2: DHV Ventures, LLC (DHV) is a Minnesota limited liability company majority-owned and controlled by Heil. At all relevant times, DHV served as a primary vehicle for the receipt and concealment of misappropriated funds. It was central to the racketeering enterprise's pattern of wire fraud and money laundering, including the execution of self-dealing transfers, insider loans, and structured reinvestment of enterprise proceeds. DHV was used repeatedly to obscure the origin and destination of funds taken from jointly owned entities, and its activities form a core part of the predicate acts alleged in this action.

4.    Defendant 3: James Wait (also known as "Jayme Wait") is an individual who served as a co-owner and member of State Storage Group, LLC. In that capacity, he participated in the enterprise by promoting legitimacy to third parties, soliciting investors, and facilitating internal efforts to remove the Plaintiff from operational control. In addition to aiding the enterprise's expansion, Wait knowingly transmitted or endorsed financial materials used to support false loan certifications and related misrepresentations to financial institutions.

5.    Defendant 4: State Storage Group, LLC (SSG) is a Florida limited liability company that engages in commercial real estate transactions and self-storage facility operations across multiple U.S. states, including Florida and Texas. It was directly involved in the acquisition, management, and disposition of properties central to this action and was used as a key operational entity within the racketeering enterprise. State Storage Group facilitated wire transfers, authorized fraudulent property transfers, and participated in the exclusion of Plaintiff from ownership and management, serving as a consistent conduit for predicate acts of wire fraud and financial misconduct alleged herein.

6.    Defendant 5: ANG Equity Holdings, LLC (ANG) is a Texas limited liability company that participated in financial transactions and property acquisitions directly related to the claims asserted in this action. At all relevant times, ANG was owned and managed by Nick Good and Austin Good, who exercised control over its business decisions and financial conduct. Through its members, ANG played a central role in approving and executing property transfers, authorizing internal account changes, and facilitating the exclusion of Plaintiff from jointly owned entities. Its actions were instrumental to the racketeering scheme described herein and establish sufficient minimum contacts with Florida and Texas.

7.    Defendant 6: Nick Good is an individual who participated in the racketeering enterprise through his role as managing member of ANG. He exercised control over enterprise transactions and authorized or assisted in property transfers and financial structuring that excluded Plaintiff from ownership and profits. His conduct supports liability for wire fraud, conspiracy, and aiding and abetting under 18 U.S.C. §§ 1343 and 1962(d).

8.    Defendant 7: Texas Built, LLC (TXB) is a Florida limited liability company involved in the acquisition and transfer of self-storage properties within Texas. It was formed and controlled by members of the racketeering enterprise, including DHV, ANG, and State Storage Southwest, LLC, and participated in transactions that are central to the claims asserted in this action. Its conduct, including coordination with affiliated entities, contributed to the interference with Plaintiff's ownership interests and forms part of the alleged conspiracy.

9.    Defendant 8: State Storage Palmetto, LLC (SSP) is a Florida limited liability company in which Plaintiff held a minority ownership interest. During the relevant period, Plaintiff was excluded from management, voting, and access to financial information, while

operational and financial control was exercised by insiders acting in concert as part of the racketeering enterprise, including Heil and affiliated entities under his control. SSP was used as the originating lender in a series of non collateralized, insider directed loans to affiliated entities, without disclosure, approval, or legitimate business justification. Its use as a funding conduit for these transactions gives rise to liability under RICO for wire fraud, conspiracy, and money laundering.

10.    Defendant 9: State Storage Tampa Bay, LLC (SSTB) is a Florida limited liability company used as a conduit for fraudulent asset transfers, including the sale of Florida properties below market value. It was controlled by central members of the racketeering enterprise and used to divert proceeds and launder funds from jointly owned assets without Plaintiff's knowledge or compensation. Its conduct supports claims of wire fraud, conspiracy, and aiding and abetting.

11.    Defendant 10: State Storage Southwest, LLC (SSSW) is a Minnesota limited liability company. It served as a controlling member of Utah Built, LLC and participated in the enterprise by receiving and deploying diverted enterprise funds through undisclosed insider transactions. Acting through Heil and Abel Sng, State Storage Southwest facilitated the concealment and reinvestment of misappropriated assets, forming a basis for liability under wire fraud, conspiracy, and aiding and abetting.

12.    Defendant 11: Utah Built, LLC (UBL) is a Utah limited liability company formed and controlled by enterprise insiders, including Heil and Abel Sng, through SSSW. In 2023, it acquired two large Utah self-storage properties using at least $1,500,000 (one million five hundred thousand dollars) in misappropriated enterprise funds. The insider loans used to

finance these acquisitions have since matured or defaulted without repayment, further evidencing the intent to launder and conceal stolen capital. Its role supports claims of wire fraud, money laundering, conspiracy, and aiding and abetting.

13.    Defendant 12: David W. Heil is an individual who serves as Chief Operating Officer of State Storage Group, LLC and is a co-owner of DHV, a central vehicle in the racketeering enterprise (See Exhibit W - David W. Heil COO). At all relevant times, David W. Heil was closely involved in the financial and operational activities of the enterprise entities, including transactions involving the diversion and reinvestment of misappropriated funds. By virtue of his executive position and paternal relationship to David J. Heil, he possessed knowledge of the scheme's unlawful nature and facilitated the flow of enterprise proceeds through insider-controlled accounts.

14.    Defendant 13: Carl Gentile is an individual who participated in the racketeering enterprise by managing CGV Holdings, LLC and signing insider loan documents related to Florida-based properties. He personally received or facilitated wire transfers that constituted misappropriation of enterprise funds. His conduct gives rise to liability for wire fraud, conspiracy, and aiding and abetting under RICO.

15.    Defendant 14: Justin Cohen is an individual who participated in the racketeering enterprise through his involvement in managing or directing affiliated entities, including Gator State Storage Boynton Beach, LLC. Cohen knowingly facilitated and received insider loan proceeds diverted from SSP and assisted in the use of enterprise funds for unauthorized purposes.

16.     CGV Holdings, LLC (CGV) is a Florida limited liability company that engaged in real estate related financial transactions involving Florida assets. It acted as a managing member of both Gator State Storage Haverhill, LLC and Gator State Storage Lake Worth, LLC and played a direct role in receiving and transferring funds derived from insider controlled loan schemes. Prior to the diversion of proceeds from SSP, CGV Holdings participated in the use of bridge or substitute financing to acquire or carry Florida self storage properties in anticipation of repayment through insider directed transfers. CGV Holdings knowingly assisted in executing coordinated transfers that furthered the racketeering scheme and is liable for wire fraud, conspiracy, and aiding and abetting.

17.     Defendant 16: Cohen Capital, LLC (CC) is a Florida limited liability company that participated in financial arrangements and loan based transactions related to Florida properties central to this action. It acted as a managing member of Gator State Storage Boynton Beach, LLC and directly benefited from the receipt and redistribution of funds diverted from SSP. CC participated in the acquisition and stabilization of Florida self storage assets using interim or bridge financing while anticipating repayment through the diversion of Palmetto sale proceeds. CCs' role in authorizing and facilitating non collateralized, insider controlled transactions supports claims of wire fraud, conspiracy, and aiding and abetting under RICO.

18.     Defendant 17: Gator State Storage WPB, LLC (GSSWPB) is a Florida limited liability company that participated in the racketeering enterprise by acting as a managing member of multiple borrower entities that received misappropriated funds. Controlled by Heil, it facilitated and approved related-party financial transfers involving insider-controlled loan structures. Its conduct supports claims of wire fraud, conspiracy, and aiding and abetting under the Racketeer Influenced and Corrupt Organizations Act.

19.     Defendant 18: Gator State Storage Haverhill, LLC (GSSHH) is a Florida limited liability company that functioned as a transactional recipient within the racketeering enterprise. It was managed and controlled by CGV and GSSWPB. In furtherance of the scheme, it received misappropriated enterprise funds through related-party loan transactions and coordinated transfers structured by enterprise members. These funds were used to retire interim financing, stabilize assets, and preserve equity while excluding Plaintiff from approval, disclosure, and economic participation. Its conduct constitutes knowing participation in wire fraud, conspiracy, and tortious interference.

20.     Defendant 19: Gator State Storage Lake Worth, LLC (GSSLW) is a Florida limited liability company used as a conduit to receive and recycle proceeds originating from the racketeering enterprise. It was controlled by CGV and GSSWPB. The entity participated in coordinated, insider-directed financial transfers designed to conceal the source of funds, retire bridge or substitute financing, and entrench enterprise control over the underlying asset. This conduct gives rise to liability for wire fraud, aiding and abetting, and conspiracy.

21.     Defendant 20: Gator State Storage Boynton Beach, LLC (GSSBB) is a Florida limited liability company that participated in the racketeering enterprise as a borrower and financial recipient of funds diverted from jointly owned assets, including proceeds originating from SSP. It was controlled in part by CC and GSSWPB. The entity received insider directed transfers used to retire preexisting financing, stabilize operations, and preserve equity, while Plaintiff was excluded from consent, disclosure, and economic benefit. Its conduct supports claims of wire fraud, conspiracy, and aiding and abetting under RICO.

22.     Defendant 21: Abel Sng is an individual who served as Chief Financial Officer during the relevant period and participated in business operations and financial structuring related to properties at issue. He acted on behalf of SSSW in authorizing insider loan transactions and the improper transfer of jointly held assets. His actions support claims of aiding and abetting, conspiracy, and wire fraud.

### Plaintiff's Standing to Assert RICO Claims

23.     Plaintiff Upstate Holdings, LLC brings this action as the real party in interest with respect to injuries arising from Defendants' racketeering conduct affecting jointly owned Florida based business ventures in which Plaintiff held a substantial ownership interest, including through its majority ownership of JHOG Holdings, LLC. Plaintiff has standing under 18 U.S.C. § 1964(c) because it suffered direct injury to its business and property by reason of Defendants' pattern of racketeering activity. These injuries include, without limitation, the diversion of enterprise proceeds, misappropriation of Plaintiff's share of asset sale revenues, intentional withholding of distributions owed to Plaintiff, and the destruction of Plaintiff's proportional equity interests. The damages are concrete, quantifiable, and personal to Plaintiff, and are not merely reflective of generalized harm to the underlying entities.

24.     Plaintiff's claims are asserted directly to the extent Defendants' misconduct caused individualized injuries distinct from any injury to the entities themselves. Defendants specifically targeted Plaintiff through exclusion from financial access and operational control, followed by self dealing transfers of jointly owned assets to insider controlled entities and the diversion of sale proceeds for Defendants' personal enrichment. These actions deprived Plaintiff of voting rights, access to financial information, distributions, and the economic value

of its ownership interests. The injuries alleged constitute special injuries suffered uniquely by Plaintiff and not ratably by other equity holders, thereby breaching duties owed directly to Plaintiff and conferring direct standing. During the same period, other members and insiders continued to receive distributions, retain access to financial information, and participate in enterprise decision-making, while Plaintiff alone was excluded, deprived of distributions, and stripped of economic and governance rights, confirming that the harm was not ratable and was uniquely inflicted upon Plaintiff. These injuries were inflicted through intentional exclusion and selective deprivation, rather than through proportional mismanagement of entity assets.

25.    In the alternative, and solely to the extent any portion of Plaintiff's injuries is deemed derivative in nature, Plaintiff brings such claims derivatively on behalf of the affected entities pursuant to Rule 23.1 and applicable law. Plaintiff was a member of each such entity at the time of the misconduct alleged herein and has continuously maintained such ownership throughout the relevant period. Plaintiff fairly and adequately represents the interests of the affected entities whose rights have been harmed by Defendants' misconduct.

26.    Pre suit demand is excused as futile because Defendants exercised complete domination and control over the management, finances, and bank accounts of the affected entities, personally authorized and executed the challenged transactions, and were the primary beneficiaries of the wrongful conduct. Under these circumstances, there was no independent or disinterested decision maker capable of evaluating or pursuing claims against Defendants in good faith, rendering demand futile and excused.


### III.    BASIS FOR JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), a federal statute.

28.    This Court also has jurisdiction under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds $75,000 (seventy-five thousand dollars), exclusive of interest and costs, and at least one defendant and one plaintiff reside in different states. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and applicable federal due process standards. The Defendants include entities and individuals located in Florida, Minnesota, Texas, and Utah among other states. SSG is organized in Florida. DHV is organized in Minnesota. UBL is organized in Utah. Heil resides in Minnesota but regularly transacts business across state lines and directs key aspects of the fraudulent scheme involving properties and transactions in Florida, Texas, and Utah. ANG, Wait and other co-conspirators also participated in an interstate racketeering enterprise involving property, business interests, and financial transactions across these and other states, subjecting them to personal jurisdiction in this District under federal law.

29.    Venue is proper in the Middle District of Florida, Tampa Division, under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events and omissions giving rise to this action occurred in this District. These include the transfer, concealment, and diversion of proceeds from Florida-based properties, as well as acts of obstruction of justice by Heil concerning the ownership, valuation, and disposition of those properties in arbitration and depositions in other judicial proceedings.

14

30.     Plaintiff resides in Florida, where the harm from Defendants' conduct was suffered.

31.     Venue is also proper under 18 U.S.C. § 1965(b), which authorizes nationwide service of process in civil RICO cases when required by the ends of justice. Because all Defendants have minimum contacts with the United States, this Court may exercise personal jurisdiction over each of them for purposes of this action.

## IV.     FACTUAL BACKGROUND

32.     Plaintiff was first introduced to Defendant Heil in 2017 through Facebook investment and business networking groups. During that time, Heil publicly posted screenshots of bank accounts showing large balances, presenting them as evidence of his personal financial strength and investment success.

33.     Plaintiff later discovered that these bank accounts did not belong exclusively to Heil but were bank accounts over which Heil had signatory access. Heil created a false impression of personal liquidity by presenting a summary list of accounts that he had access to but did not belong to solely him.  Heil intentionally condensed and presented screenshots of those combined balances through his personal mobile banking app. Plaintiff relied on these misrepresentations of Heil's personal liquidity in forming what appeared to be a legitimate business relationship and co-investment structure.  In other words, Heil represented the various business accounts as his own in order to induce the plaintiff by fraud to believe he was a financially strong potential business partner.

34.     These misrepresentations of fact were not uncovered until after Plaintiff and Heil had jointly acquired assets and Plaintiff gained access to the relevant accounts. At that point, it

became evident that Heil had knowingly made false representations of material fact regarding his financial standing to induce Plaintiff's participation and secure his trust in co-investing in the properties.

35.    Heil further induced the Plaintiff's trust and participation by introducing Wait as a blue collar, hard-working business partner to his proposed real estate venture because Wait's participation reinforced the image of a grounded and reliable team. Plaintiff was induced to believe that Wait was actively involved in operations, lending credibility to the proposed real estate ventures and legitimizing the partnership. Heil also publicly documented his partnership with Wait online, using their perceived dynamic to build trust and recruit other investors and partners, many of whom were later misled or excluded as part of the broader racketeering scheme.

36.    However, upon closing on the first property, Plaintiff was informed that Wait was not involved in daily operations and merely followed Heil's directives. Wait was a 40% minority owner of SSG, while Heil maintained controlling interest at 60%. In practice, Heil retained unilateral control over business decisions, financial accounts, and strategic direction, contrary to the collaborative relationship initially presented.

37.    In mid-2017, Plaintiff contracted to purchase a vacant parcel at 12501 Belcher Road, Largo, Florida, but closing was delayed until January 2018 due to environmental remediation obligations required of the seller.

38.    In early 2018, shortly after the closing on the 12501 Belcher Road vacant land property, Emad Baddour, an early investor and listed member through his affiliated entity, began raising serious concerns about the complete lack of planning and development progress.

The property had been under contract for more than six months while environmental remediation was ongoing, giving Heil ample time to secure construction financing prior to closing on the vacant land. Despite this window, Heil failed to line up a construction lender or take any meaningful steps toward development. Although Heil had represented that construction would begin immediately, the project remained stalled, and no lender had been engaged or approved. Baddour came to believe that Heil had misled him about the viability of the project and lacked both the financing and the ability to execute. Concluding that he had been misled, Baddour demanded the return of his investment. Rather than return the funds, Heil sought replacement capital and introduced ANG into the deal to cover the shortfall and remove Baddour from the picture (See Exhibit L - GSSTB Emad Buyout). To conceal Baddour's prior involvement, Heil deleted earlier versions of the operating agreements from Plaintiff's corporate email account, which had listed Baddour and his entity as members. This deletion was unauthorized and part of Heil's broader effort to rewrite the partnership history, suppress evidence, and eliminate any trace of displaced members from the corporate record.

39.    In March 2018, Plaintiff and the same group of partners, including Heil, Wait, ANG, and their affiliated entities, form a new Florida entity State Storage Lubbock LLC (SSL) and closed on the purchase of three self-storage facilities totaling approximately 85,000 square feet in Lubbock, Texas. These properties marked the beginning of the partnership's expansion into the Texas market and demonstrated Plaintiff's early and substantial financial involvement across multiple states.

40.    After closing on the Lubbock properties in March 2018, Plaintiff identified that a recent storm had caused visible roof damage to one or more of the facilities. Plaintiff contacted a local roofing contractor who confirmed the damage and offered to perform a full roof

replacement as part of a pending insurance claim. An insurance payout of $602,000 (six hundred two thousand dollars) was eventually issued to SSL in January 2019 after a lengthy claims process. Rather than proceed with the recommended repairs, Heil insisted that the roofing work not be performed and instead directed the funds to be handled privately. Shortly thereafter, Heil caused the full amount of the insurance proceeds to be transferred from the company's Wells Fargo account into an account not owned by SSL and to which Plaintiff had no access or visibility. ANG, despite being aware of the transaction, raised no objection and permitted the funds to be diverted. No roof repairs were ever performed using the insurance proceeds, and the funds were never returned or disclosed. The $602,000 (six hundred two thousand dollars) transfer constituted a clear act of misappropriation, executed with intent to defraud, and formed an early part of the broader racketeering scheme to convert jointly owned assets, conceal enterprise income, and unjustly enrich the Defendants at Plaintiff's expense.

(See Exhibit C – Wells Fargo Bank Statement Showing $602,000 Transfer)

41.    In June 2018, Plaintiff, ANG, SSG, and a fourth co-investor formed a new entity, SSP, for the purpose of acquiring and developing approximately seven acres of land located at 4055 U.S. Highway 19, Palmetto, Florida. Plaintiff identified the site, negotiated the purchase contract, and successfully led the effort to close the transaction. The partners, including Plaintiff, paid cash for the land according to their respective ownership percentages, with no financing involved.  Plaintiff also led the original site design, retained the civil engineering team, and took initiative in advancing the project.  At this stage, Plaintiff remained fully engaged in sourcing deals, managing investor relationships, and driving the overall business strategy.

42.    In July 2018, nearly a year after the property acquisition, Plaintiff secured loan approval from a subprime lender, BD Capital, after an extensive multi-month search. The loan ultimately closed on or about November 2018 and carried an interest rate approximately 50 percent higher than what could have been obtained through a reputable banking relationship. Plaintiff had undertaken the search for financing to preserve capital and stabilize the Largo project, following Emad Baddour's demand to be bought out earlier that year and growing concerns about Heil's conduct and credibility. Although Heil repeatedly claimed to have financing sources lined up, no one ever materialized. These misrepresentations were central to his perceived value in the partnership and to his role in the broader racketeering scheme. Plaintiff did not uncover the falsity of Heil's claims until it was too late to unwind the resulting damage.

43.    The BD Capital loan was for $1,100,000 (one million one hundred thousand dollars), while the appraised cost of construction was approximately $1,900,000 (one million nine hundred thousand dollars). Despite knowing that the approved loan would be insufficient to complete the project, Heil moved forward, primarily to create the appearance of progress for the benefit of co-investor ANG.

44.    Upon closing the loan, Heil directed a transfer of $175,000 (one hundred seventy-five thousand dollars) from the loan proceeds to GSSWPB, an entity he controlled. While the payment was disclosed as repayment for funds Heil had previously loaned, not contributed, to facilitate the original land acquisition, it was made entirely for his own benefit, despite knowing it would further undercapitalize GSSTB.  At the time of the transfer, the project was already underfunded, and Heil's actions exacerbated the financing shortfall to the direct detriment of GSSTB and Plaintiff, who received no benefit from the transaction.

45.    Following extended delays, the construction permit for the GSSTB project was finally issued in April 2019, and vertical work (construction of buildings – as opposed to horizontal work which involves laying foundations) began shortly thereafter. At that stage, operations appeared to be moving forward as expected.  Based on the apparent progress and continued business activity, Plaintiff continued collaborating with Defendants on additional facility developments throughout 2018 and 2019, involving commercial real estate acquisitions and planning across multiple states, including Florida and Texas.

46.    In the spring of 2019, an existing self-storage property located at 13001 Belcher Road, Largo, Florida 33771 (located approximately one-quarter mile up the road from the 12501 Belcher property), became available for sale.  Acting as a licensed real estate agent, Plaintiff located the deal, negotiated its terms, and placed it under contract on behalf of the same group of partners involved in the GSSTB project, including plaintiff. The transaction successfully closed in April 2019, further expanding the partnership's portfolio.

47.    On or about April 6, 2019, ANG publicly celebrated the acquisition in a Facebook post, stating how excited they were to be working with Plaintiff and "taking over Florida" alongside Heil and his team. The post acknowledged that ANG was now involved in five facilities with Heil, reflecting growing business activity and shared promotional efforts across multiple states.

48.    On or about April 30, 2019, Heil publicly posted a photo of Plaintiff actively overseeing construction operations at the 12501 Belcher Road site. The photo captured Plaintiff managing a 100-yard concrete pour, which Plaintiff supervised at no cost, further contributing personal time and expertise to the project. This public acknowledgment by Heil

20

confirmed Plaintiff's ongoing, hands-on role in advancing the development just months before Defendants began taking coordinated steps to exclude Plaintiff from control and ownership of the business.

49.    In May 2019, Plaintiff, ANG, and SSG formed a new entity, State Storage Amarillo, LLC (SSA), for the purpose of acquiring a self-storage facility in Amarillo, Texas. The facility was newly constructed and largely vacant at the time of purchase, requiring an aggressive lease-up period to reach sustainable occupancy and revenue. The lease-up period is the critical window from opening until the facility is fully rented, during which experienced management is essential to success. The property was offered at a favorable price due to the original owners' inability to attract tenants. The purchase was structured with a 24-month balloon payment, requiring full payoff of the property within two years. Plaintiff agreed to take on this added risk based on Heil's repeated assurances that he had proprietary lease-up techniques and could successfully stabilize any facility in any market. These representations later proved to be false. Relying on Heil's claims, Plaintiff contributed significant time and strategic input into both the acquisition and operations of the Amarillo facility, despite limited buy-in from the other members.

50.    On or about May 10, 2019, Heil again publicly posted about Plaintiff's direct involvement in the 12501 Belcher Road construction project, this time while Plaintiff was overseeing the erection of the first buildings on the site. The post further confirmed Plaintiff's central, hands-on role in the development. At the time, Plaintiff believed these posts reflected genuine recognition of Plaintiff's contributions. However, it later became clear that the public accolades were part of a calculated strategy by Heil to portray Plaintiff as a visible success story, a "poster boy" for the partnership, used to project credibility and attract additional

investors and partners to the enterprise. This would ultimately serve as a setup for Plaintiff's exclusion once the public image had served its purpose. The May 10th post was the last public acknowledgment of Plaintiff's involvement prior to a series of actions beginning approximately 60 days later in which Defendants began systematically removing Plaintiff from financial access, decision-making, and ownership control.

51.    Between May 2019 and June 2019, with multiple facilities now operational, including the Lubbock portfolio, the Amarillo property, and the newly acquired 13001 Belcher Road facility in Florida, the significant deficiencies in Defendants' operation and funding became too significant for Plaintiff to ignore. Despite having previously sourced deals, conducted underwriting, and vouched for Defendants in business dealings, Plaintiff ceased identifying or pursuing new acquisitions on Defendants' behalf during this period. It became increasingly clear that the partnership was not operating as it had been represented, and that the internal structure lacked the systems, transparency, and competence Heil had consistently publicly and privately represented.

52.    While Heil frequently boasted about his exclusive bank connections, it was Plaintiff who secured the lender for all three Lubbock properties and arranged financing for the Amarillo facility. Heil also claimed that he used proprietary software systems and centralized operations with cross-utilization of management personnel across facilities, but these claims proved false. For example, after the closing of the Amarillo facility, Plaintiff attempted to implement the pre-agreed operational plan to forward customer calls to another of Heil's existing locations. Heil then reversed course and stated that forwarding calls would "overwhelm" his staff and instead instructed Plaintiff to answer all customer calls personally, without compensation, effectively relegating Plaintiff to the role of an unpaid customer service

employee under Heil's full control, with no authority and no acknowledgment of Plaintiff's equity interest or labor contributions.

53.    The same pattern emerged at the 13001 Belcher Road property. Plaintiff personally oversaw the renovations and site improvements, again without compensation, and simultaneously continued supervising construction at the 12501 Belcher Road project. These efforts were made in good faith to keep both developments moving forward, even though the partnership remained woefully underfunded and disorganized under Heil's direction. Plaintiff took on day-to-day oversight responsibilities typically handled by paid contractors, employees or project managers, relying on the understanding that the partnership was mutual, and that equity interests and profits would be honored once operations stabilized. Instead, Heil leveraged Plaintiff's efforts while withholding meaningful authority or financial recognition from Plaintiff.

54.    On  July 2, 2019, Heil, Wait, and representatives of ANG participated in an internal email exchange explicitly discussing a coordinated plan to remove Plaintiff from management and operational control of the jointly owned entities. During this exchange, one or more participants cautioned that certain aspects of the plan should not be reduced to writing and should instead be handled verbally, to avoid creating a discoverable record. This instruction to limit written communications demonstrates Defendants' awareness of the wrongful nature of the conduct being planned and their intent to conceal it. The July 2, 2019 email chain evidenced a knowing agreement among Defendants to exclude Plaintiff and to carry out that plan through coordinated action. The events that immediately followed confirm that this was not idle discussion but an agreed-upon course of conduct that was subsequently executed. (See Exhibit X – Conspiring Email.)

23

55.    On July 9, 2019, just one day after over $100,000 (one hundred thousand dollars) was transferred from GSSTB company accounts into Heil's personal account, Plaintiff was formally removed from his managerial rights in GSSTB. This action was carried out by Austin Good (acting on behalf of ANG), and Heil (acting on behalf of SSG), the only two other members of GSSTB besides Plaintiff. The removal came shortly after Plaintiff had begun expressing concerns (via verbal and email communications with all partners) about mismanagement and financial irregularities and withdrew support for further expansion. Rather than address those concerns, Defendants moved to eliminate Plaintiff's authority and isolate him from any control over the jointly owned Largo-based properties.

(See Exhibit D – Notice of Managerial Removal, dated July 9, 2019.)

56.    In addition to being deprived of managerial rights in GSSTB, Plaintiff was also removed from all Wells Fargo business bank accounts in July 2019. These accounts were held across multiple entities in which Plaintiff held ownership and signatory authority, including but not limited to GSSTB, SSP, SSL, SSA. The removal, which involved deleting Plaintiff's name and access to all Wells Fargo accounts, occurred without prior notice or Plaintiff's consent and was executed by Heil, in coordination with ANG and other related parties. This calculated exclusion from financial oversight represented a further step in Defendants' scheme to eliminate Plaintiff from all business control, divert assets without transparency or Plaintiff's knowledge, and consolidate power under Heil's direct authority.

57.    In July 2019, as Defendants were actively removing Plaintiff from managerial control of GSSTB and simultaneously removing him from access to half a dozen bank accounts, Heil transferred an additional $157,000 (one hundred fifty-seven thousand dollars) from a SSL account into his personal bank account. The transfer occurred on or about July 29,

2019. Plaintiff was never notified, did not consent, and never received any documentation substantiating the legitimacy of the transaction. At the time of this transfer, Plaintiff had already been excluded from internal communications and bank access, leaving him unable to monitor or contest the withdrawal. The timing of this transfer, within three weeks of Plaintiff's formal removal from GSSTB and alongside a concurrent $100,000 (one hundred thousand dollars) withdrawal from a Florida company account, highlights the coordinated nature of Defendants' scheme to strip Plaintiff of financial access while simultaneously draining enterprise assets for personal gain.

(See Exhibit M – July 2019 Bank Statement Showing $157,000 Transfer to David Heil.)

58.     Shortly after stripping Plaintiff of management rights and access to company accounts, Heil proceeded to delete Plaintiff's corporate email accounts associated with SSG and affiliated entities without notice or authorization and during a period in which disputes had escalated and legal action was reasonably foreseeable. Plaintiff was also blocked from internal communication platforms used by the enterprise, including shared messaging groups, document drives, and team based project collaboration networks, which eliminated Plaintiff's access to company records and materially obstructed his ability to recover digital correspondence and assert his rights as a co owner. As later confirmed under sworn deposition testimony on July 22 2021, Defendant Heil testified that administrators under his control "killed" Plaintiff's enterprise email account as part of a coordinated "clean sweep", that the account was deleted with no archives, and that this occurred weeks before litigation was initiated. This testimony is corroborated by the sworn deposition testimony of Austin Good, who confirmed that State Storage Group required enterprise communications to be conducted through centralized Google hosted corporate email accounts and that those accounts contained

emails concerning construction budgets, cost overruns, and requests for additional capital, the deletion of which eliminated Plaintiff's ability to access or recover records while Defendants retained administrator level control over the system.

59.     As previously noted, the development at 12501 Belcher Road in Largo remained chronically underfunded due to Heil's failure to secure adequate financing. To keep construction moving, the members caused SSL to issue short-term loans to GSSTB, the entity developing the project. Both entities had the same members: Plaintiff, ANG, SSG. In July and August 2019, immediately after removing Plaintiff from management and financial accounts, Defendants orchestrated a manufactured capital crisis by causing SSL to prematurely call its loans to GSSTB, in direct violation of the loan terms and without any legitimate urgency (See Exhibit G - Email calling all loans early). Plaintiff formally voted against the loan acceleration, but Defendants proceeded anyway, acting unilaterally and improperly on behalf of SSL. At the time, GSSTB was already severely cash strapped. The resulting capital call was structured so that ANG and SSG would effectively repay themselves from GSSTB through SSL, while using the unpaid balance as a pretext to dilute Plaintiff's ownership. This maneuver was calculated to force Plaintiff out of the 12501 Belcher project by creating a scenario where no rational investor would contribute additional capital to a venture they were systematically being removed from. Defendants exploited this strategy to push Plaintiff out while continuing to control and benefit from a property he had played a central role in developing.

60.     In response to these coordinated exclusion efforts and the improper recall of member loans, Plaintiff retained counsel, who issued a formal cease and desist letter dated September 4, 2019, addressed to both SSG and ANG. The letter demanded that Defendants immediately halt further breaches of fiduciary duty, including the wrongful removal of Plaintiff

from managerial authority, unauthorized exclusion from all Wells Fargo bank accounts, and the acceleration of member loans for the sole purpose of diluting Plaintiff's ownership interest. The notice placed Defendants on clear legal notice that their actions violated Florida law and Plaintiff's rights as a member of GSSTB and related entities  (See Exhibit E – Cease and Desist Letter from Cotney Construction Law).

61.    Despite being placed on notice by Plaintiff's counsel via cease-and-desist letter, Defendants escalated their misconduct. On or about September 26, 2019, they executed a transfer of the 12501 Belcher Road property into a newly formed entity, the "12501 S Belcher Trust," through a Consent to Action signed by David Heil on behalf of SSG and Austin Good on behalf of ANG, entirely excluding Plaintiff from the transaction. At the time, the property remained encumbered by a commercial construction loan from BD Capital, personally guaranteed by Plaintiff. Defendants carried out the transfer without Plaintiff's consent or notification, did not satisfy the underlying debt, and knowingly violated the loan's due-on-sale clause. As a result, Plaintiff remained exposed to substantial personal liability while being stripped of any managerial authority, financial benefit, or legal protection. The trust structure was deliberately used to obscure ownership, block Plaintiff from asserting his legal and financial rights, and conceal the misappropriation of a jointly developed asset, despite Plaintiff's repeated demands for transparency and access to financial records (See Exhibit F – Consent to Sale and transfer of 12501 Belcher Road).

62.    On or about October 20, 2019, Plaintiff filed an emergency complaint in the Sixth Judicial Circuit Court for Pinellas County, Florida, seeking injunctive relief, judicial dissolution of GSSTB, or the appointment of a receiver. This action followed Defendants' continued exclusion of Plaintiff from financial and operational control and was precipitated by

the default on the construction loan with BD Capital—a payment that went unmet despite the fact that company accounts, under Defendants' exclusive control at the time, had recently held sufficient funds to satisfy the obligation. Just weeks prior, over $100,000 (one hundred thousand dollars) had been withdrawn from those same accounts and diverted for the personal benefit of Heil, demonstrating that Defendants not only possessed adequate funds but chose to misappropriate them, allowing the loan to default and exposing Plaintiff to substantial personal liability as guarantor. These events confirmed that Defendants were operating the enterprise in a manner that was reckless, self-serving, and designed to further isolate and harm Plaintiff as a co-founder and equity holder (See Exhibit H – Verified Emergency Complaint for Injunctive Relief).

63.    On January 24, 2020, Plaintiff sent a formal communication objecting to the continued mismanagement of the Amarillo property and recommending that the asset be sold to limit further losses. By that point, the project had proven unsustainable, and Plaintiff had been repeatedly denied access to financial records, management systems, and operational oversight. Despite these concerns, Defendants continued to assert exclusive financial control and issued yet another capital call. Given Plaintiff's exclusion from all operational roles and lack of access to material information, participation in the capital call was both commercially unreasonable and legally untenable. After Plaintiff declined to contribute additional capital under these conditions, Defendants executed actions to terminate his ownership interest in the Amarillo property. This forced removal occurred shortly after his January 2020 correspondence and followed a broader pattern of conduct by Defendants. As with the Florida projects, Defendants used the structure of capital calls as a mechanism to extract value from Plaintiff

and then eliminate his equity position, ultimately depriving him of any ownership, benefit, or recourse (See Exhibit I – Email from Plaintiff re Amarillo).

64.    In April 2020, while Defendants were actively being sued by Plaintiff for the fraudulent transfer of the adjacent property at 12501 Belcher Road, Defendants carried out another major self dealing transaction. At that time, Plaintiff remained entirely excluded from operational access. Defendants Heil and Nick Good, acting through entities under their control including SSG and ANG, caused the formation of a newly created entity named SSTB, which was separate from the original GSSTB entity co owned by Plaintiff. Although Austin Good, now deceased, appeared as a named signatory or member on certain formation or transfer documents, the formation and subsequent transactions were directed and executed by Defendants Heil and Good. Shortly after SSTB was formed, Defendants transferred the 13001 Belcher Road property, an asset jointly acquired and improved with Plaintiff, to SSTB at a price of approximately half its fair market value. Plaintiff received no proceeds or disbursement from the transaction, despite holding a valid equity interest and having contributed substantial labor and oversight during the property's renovation. This sale, executed unilaterally and while litigation over a parallel transfer was ongoing, further evidences the deliberate and continuing nature of Defendants' scheme to strip Plaintiff of ownership, launder proceeds through affiliated entities, and conceal the financial condition of the enterprise.

65.    Following the April 2020 transfer of the 13001 Belcher Road property to State SSTB, GSSTB received over $150,000 (one hundred fifty thousand dollars) in proceeds from the transaction. Rather than distributing the funds in accordance with ownership interests or applying them to company obligations, Defendant Heil caused $111,000 (one hundred eleven

thousand dollars) of the proceeds to be transferred directly into his personal bank account. This transfer was executed in April 2020, during active litigation concerning a prior fraudulent transfer of the 12501 property, and while Plaintiff remained fully excluded from operational and financial access. The transaction is documented in GSSTB's April 2020 Wells Fargo bank statement. Defendant ANG was aware of the transfer and did not object. Members of SSTB, including entities and individuals acting in concert with Heil, similarly allowed and benefitted from the transaction. The diversion of $111,000 (one hundred eleven thousand dollars)  in corporate sale proceeds into Heil's personal account without notice, consent, or any legitimate justification represents a clear act of misappropriation and continues the racketeering pattern of using affiliated entities to conceal the conversion of jointly owned assets (See Exhibit R – GSSTB Bank Statement Showing $111,000 Transfer to Heil.)

66.    Also in April 2020, Heil caused $427,351 (four hundred twenty-seven thousand three hundred fifty-one dollars) to be transferred from a bank account belonging to SSL directly into his personal bank account. The transfer occurred without Plaintiff's knowledge or consent, and Plaintiff received no portion of the funds despite maintaining a valid equity interest in SSL. At the time of the transfer, Plaintiff had been fully excluded from all operational roles and financial access to SSL. The transaction was not supported by any promissory note, repayment agreement, corporate resolution, or documented distribution authorization. The transfer occurred during active litigation concerning prior asset transfers and coincided with contemporaneous personal withdrawals from Florida based enterprise entities. These circumstances demonstrate that the transfer was not an ordinary business transaction but part of Defendants' ongoing pattern of unauthorized diversion of enterprise funds. (See Exhibit T – April 2020 SSL Bank Statement Showing $427,351 Transfer to Heil).

67.    Between 2020 and 2021, while litigation was pending and arbitration preparations were underway, Defendants continued to manipulate ownership structures and conceal assets. In April 2021, Defendants transferred the 12501 Belcher Road property out of the previously created trust and into the newly formed SSTB—the same entity to which they had previously self-dealt the 13001 Belcher Road property. This maneuver further consolidated control over Plaintiff's former assets under a separate ownership structure designed to exclude him. In response, and to prevent further transfers or encumbrances during the ongoing dispute, Plaintiff filed Lis pendens notices on both the 12501 and 13001 Belcher Road properties in June 2021, placing third parties on notice of Plaintiff's claims and compelling disclosure of the legal issues surrounding ownership and control.

(See Exhibit K – Lis Pendens Filings June 2021.)

68.    Following the breakdown in communications and multiple self-dealing transactions by Defendants, Plaintiff's emergency action filed in 2019 ultimately proceeded to mediation and then to arbitration under AAA (American Arbitration Association) Case No. 01-20-0014-1473.  This culminated in a formal evidentiary hearing in July 2021. Defendant Austin Good, a key participant in the scheme, passed away in October 2020, prior to the arbitration. Plaintiff prevailed at arbitration, with the arbitrator finding that Defendants breached their fiduciary duties, improperly removed Plaintiff from management without authority, and transferred company assets known as the 12501 and 13001 Belcher Road properties, to affiliated entities without required consent.

69.    While Plaintiff's October 20, 2019 emergency action remained pending and the related dispute had already progressed through mediation and into active arbitration before the American Arbitration Association, Defendant Heil executed loan documents and certifications

to Synovus Bank containing materially false representations concerning the absence of legal proceedings affecting the borrower and its assets. Specifically, in connection with Loan Note 10, dated April 8, 2021, Heil, acting on behalf of the borrower, certified that "there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower" that could materially affect its business, property, or financial condition. This representation was false when made. At the time of execution, Plaintiff's 2019 lawsuit had not been resolved, and the arbitration arising from that action was already underway, with a formal evidentiary hearing scheduled for July 2021. These proceedings directly challenged Defendants' authority, fiduciary conduct, and the prior transfer of the 12501 and 13001 Belcher Road properties that were pledged as collateral. Heil's certification concealed the existence of these proceedings from Synovus Bank and was material to the bank's underwriting and credit decisions, forming part of Defendants' continuing scheme to obtain and maintain financing through misrepresentation.

70.    Although Plaintiff prevailed on liability at arbitration, the award included only nominal damages due to Defendant Heil's obstruction of justice during the arbitration. Heil falsely testified regarding the value of the 12501 Belcher property, claiming it was worth only slightly more than the amount for which it had been transferred to an affiliated entity. He also withheld contemporaneous appraisal reports, which were later uncovered during separate litigation, confirming the property was in fact worth more than twice the amount Heil testified to under oath. By concealing this material evidence, Defendants deprived Plaintiff of an accurate valuation and the ability to recover meaningful damages during arbitration. This concealment forms a central part of the fraudulent scheme alleged in this RICO action.

(See Exhibit J – Interim Award of Arbitrator)

71.     Despite ongoing litigation, Lis pendens filings, and a pending arbitration, Defendants showed no intention of ceasing their misconduct. In a continuation of their asset-stripping and concealment tactics, Defendants transferred all three Lubbock, Texas self-storage properties previously co-owned by Plaintiff and acquired in 2018, into a newly formed entity named TXB. The transfers were executed in December 2021 at prices approximately half of the properties' fair market values, as confirmed by appraisals that were later produced in litigation. SSG and ANG remained members in the newly formed TXB, and brought in additional partners, continuing the pattern of using affiliated entities and new participants to launder funds, obscure ownership, and perpetuate the racketeering enterprise. Plaintiff received no compensation or notice of these transactions, despite his original equity interest and financial contributions to the three Lubbock, Texas facilities.

72.     Emboldened by the absence of enforcement or consequences for their prior misconduct, Defendants escalated their efforts to eliminate Plaintiff's remaining leverage. In February 2022, SSTB, which was controlled by the same individuals who orchestrated the transfers of the Largo and Lubbock properties, filed a slander of title and libel lawsuit against Plaintiff to force removal of the Lis pendens notices filed on the 12501 and 13001 Belcher Road properties. This lawsuit was filed even though Plaintiff had a documented ownership interest in the original entities tied to the properties and was actively engaged in pending arbitration over the very same issues. The filing constituted a clear act of retaliation, designed to suppress Plaintiff's legal rights, intimidating him through litigation, and further conceal the enterprise's continued self-dealing and obstruction. It also marked another attempt to weaponize the legal system to deter Plaintiff from exposing ongoing fraud and asserting valid claims.

73.     The obstruction and concealment continue to present day. In November 2025, Plaintiff was forced to initiate additional judicial actions in Palm Beach County, Florida and Pinellas County, Florida against multiple affiliated entities under Defendant Heil's de facto control after Heil refused to produce required financial and corporate records despite Plaintiff's statutory and contractual rights as a member. Each such entity was expired on Sunbiz at the time but remained controlled and operated by Heil, who continued to withhold records necessary to trace enterprise funds, transactions, and ownership interests. This ongoing refusal to produce records further evidences Defendants' deliberate efforts to obstruct oversight, conceal misconduct, and frustrate Plaintiff's ability to uncover and recover misappropriated assets.

74.     In April 2022, while litigation between Plaintiff and SSTB was pending, Plaintiff received an email from Heil demanding a $400,000 (four hundred thousand dollars) "settlement" within 48 hours. The message threatened to "chain up the doors on all the small assets under Upstate Holdings, LLC" and warned that any attempt to transfer those assets would be met with claims of "fraudulent transfer." It further asserted that over $900,000 (nine hundred thousand dollars) in losses had been "documented" and that attorney's fees would be pursued in addition. The message concluded with the warning: "Govern yourself accordingly." This communication, made during active litigation and without lawful authority, was plainly intended to intimidate Plaintiff into surrendering legal claims and accepting personal liability. The use of threats to obtain property or compel payment constitutes attempted extortion in violation of 18 U.S.C. § 875(d) and further supports the pattern of racketeering activity alleged under 18 U.S.C. §§ 1962(c) and (d).

(See Exhibit Z – DH Extortion Email)

75.    During discovery in the SSTB v. Upstate Holdings, LLC litigation, initiated in February 2022 and continuing through at least 2024, Plaintiff finally obtained access to appraisal reports for the 12501 and 13001 Belcher Road properties, which Defendants had previously claimed did not exist. The reports were dated prior to Heil's deposition testimony during AAA arbitration, in which he falsely stated under oath that the properties were worth no more than the prices for which they had been transferred to affiliated entities. The appraisals later obtained showed that the properties were worth approximately double the amounts represented and transferred, confirming that Defendants knowingly withheld material evidence to obstruct the arbitration process and avoid a proper damage ruling. This concealment prevented Plaintiff from receiving just compensation and underscored Defendants' calculated strategy to manipulate legal proceedings, suppress critical valuation data, and preserve the enterprise's control over misappropriated assets.

76.    In May 2020, while Defendants ANG and SSG were actively engaged in litigation concerning fraudulent transfers and concealment of enterprise assets, they executed a lease agreement transferring operational control of all three Lubbock facilities owned by SSL to TXB, an entity under their control. Heil controlled SSG, and Austin Good controlled ANG, and both acted through their respective entities to facilitate the transaction. The lease was structured to redirect all income generated by the properties toward baseline operating expenses and debt service only, leaving no profits available for distribution to equity holders such as Plaintiff. The transaction was carried out without Plaintiff's knowledge or consent, despite his continued equity interest in SSL. Critically, the lease agreement was signed on behalf of both the landlord and the tenant by ANG, which acted in both capacities through affiliated entities. This dual execution provides direct evidence of coordinated self-dealing and

confirms that the lease was not the result of an arm's-length transaction. It was a calculated effort by Heil and Good to divert enterprise income, conceal internal financial activity, and eliminate any remaining financial benefit owed to Plaintiff. Rather than correct past misconduct, Defendants continued the racketeering scheme through overlapping control of shell entities and sham agreements designed to retain profits and obstruct accountability (See Exhibit V – Lease Agreement Between SSL and Texas Built, dated May 15, 2020)

77.    Despite the ongoing litigation in SSTB v. Upstate Holdings, LLC (Pinellas County, Florida Docket #22-000684-CI), Defendant Heil continued diverting funds from enterprise entities for personal use. On or about November 2022, Heil caused $70,000 (seventy thousand dollars) to be transferred from a GSSTB account into a known personal bank account under his control. Plaintiff was never informed of the transaction, did not authorize it, and received no share of the disbursement. No documentation or corporate resolution was provided to explain or justify the transfer, and Plaintiff is unaware of any legitimate business purpose or formal approval process having occurred. At the time, GSSTB was directly involved in active litigation over fraudulent asset transfers and financial concealment, and Plaintiff remained fully excluded from all financial oversight. The transaction is documented in GSSTB's November 2022 Wells Fargo bank statement. This act of personal enrichment during active litigation reflects the ongoing nature of the racketeering scheme and continues the pattern of concealed transfers, misuse of enterprise funds, and deliberate exclusion of Plaintiff from jointly earned proceeds.

(See Exhibit U – GSSTB Bank Statement Showing $70,000 Transfer to Heil, dated November 2022.)

78.     Following the concealed transfer of the three Lubbock, TX properties into TXB, each executed without notice, proper valuation, or compensation to Plaintiff, Plaintiff initiated formal legal action. On March 21, 2023, Plaintiff filed a civil complaint in Palm Beach County, Florida, asserting claims against Heil & TXB for unjust enrichment, Criminal Scheme, and Conspiracy to engage in criminal scheme among other claims. The filing came in response to Defendants continued use of affiliated entities to obscure ownership, divert profits, and deprive Plaintiff of rightful distributions. This lawsuit marked the beginning of a broader investigation into the extent of Defendants' self-dealing, ultimately contributing to the development of this RICO action (See Exhibit P – SSL Complaint against Texas Built).

79.     In August 2023, SSP sold its only asset, the entitled land located at 4055 U.S. Highway 19 in Palmetto, Florida. The property was jointly owned by Plaintiff, ANG, SSG, and 321 Investments LLC through their membership interests in SSP. The sale occurred without Plaintiff's knowledge or consent, and he was notified only after closing that the property had been sold for several million dollars in profit. This was particularly egregious given that Plaintiff personally located, negotiated, and contracted for the property, designed the site layout, and submitted the project for permitting. These efforts directly contributed to the property's entitlement status and significantly increased its market value. Despite holding a valid equity interest in SSP, Plaintiff received none of the sale proceeds.

80.     On the same day the sale funds were received, Defendants executed a series of transfers from the SSP bank account that rapidly drained it to a nominal balance and left the company without meaningful liquid assets. Defendants later claimed that a majority of members had agreed to loan the proceeds to affiliated entities for use in new investments. Plaintiff was never consulted, never permitted to vote, and was not provided with any formal

documentation. He received only a vague summary identifying the recipient entities, majority of which included UBL, GSSHH, GSSBB, and GSSLW, without any explanation of the guarantees, collateral, or protections. These purported loans have since matured and remain unpaid, confirming they were merely a pretext to divert proceeds into insider-controlled entities while unlawfully excluding Plaintiff from the economic benefits of the sale.

81.    Upon obtaining the underlying loan documentation, Plaintiff discovered that the post sale reinvestment of Palmetto proceeds was not a legitimate investment strategy but part of a coordinated self dealing arrangement designed to misappropriate and conceal funds. The most egregious example involved a $1,500,000 (one million five hundred thousand dollars) wire transfer from SSP to UBL pursuant to a promissory note dated August 24, 2023 (Exhibit N - $1.5 Million Loan Agreement Between SSP and Utah Built LLC). The note reflects that Heil signed on both sides of the transaction, acting through DHV on behalf of the lender and through SSSW on behalf of the borrower. The loan carried no collateral, no personal guarantees, and no meaningful protections for the members of SSP. Similar insider directed transfers were made to the Florida recipient entities, each of which had acquired self storage facilities prior to the Palmetto sale using bridge or substitute financing while anticipating repayment from the Palmetto proceeds. According to Defendants' own lender financial statements, the Florida properties reflected substantial equity and stabilization following the infusion of Palmetto proceeds.

82.    In 2022 and early 2023, Defendants caused UBL, an entity controlled by David J. Heil and Abel Sng, to contract for and acquire two high value self storage properties in Utah, known as Cedar City Shops and Cedar City Storage, using bridge or substitute financing obtained through affiliated entities within the racketeering enterprise. These acquisitions were

undertaken in anticipation of the planned diversion of proceeds from the sale of SSP and were structured to permit Defendants to later retire, stabilize, or refinance that interim financing using misappropriated Palmetto funds. Following the August 2023 sale of the Palmetto property, Defendants diverted at least $1,500,000 (one million five hundred thousand dollars) in enterprise funds through an insider loan from SSP to UBL for that purpose. The purported loan was routed through affiliated entities under Defendants' control and lacked any indicia of a legitimate arm's-length transaction, confirming it functioned as a mechanism to conceal the true source and use of misappropriated funds.

83.     According to Defendant Heil's own representations to lenders, the Utah properties now hold equity in excess of $25,000,000 (twenty five million dollars). Despite Plaintiff's funds being essential to retaining, stabilizing, and refinancing down payments on both the Utah properties, Plaintiff was excluded entirely from ownership, profits, and control. The coordinated use of bridge financing followed by the diversion of Palmetto proceeds reflects a premeditated and recurring pattern within the enterprise of self dealing, concealment, and the conversion of Plaintiff's economic interests for Defendants' benefit.

84.     The same bridge financing and post-sale diversion scheme was employed with respect to the Florida recipient entities, including GSSBB, GSSHH, and GSSLW. Plaintiff seeks disgorgement and equitable relief with respect to the equity and income derived from the Utah and Florida properties to the extent such equity was created, preserved, or enhanced through the diversion of SSP proceeds.

85.     In an attempt to maintain the appearance of legitimacy, Defendants issued partial distributions to Plaintiff upon request through early summer of 2024, specifically relating to his

equity interest in SSP. These payments implicitly acknowledged Plaintiff's continuing ownership in the entity. However, the distributions to Plaintiff were abruptly halted under the pretext of accounting errors, even as all other members continued receiving their shares without interruption. When Plaintiff raised objections and submitted a reconciled accounting showing that his distributions had been selectively withheld and remained incomplete, Defendants did not correct the discrepancy. Instead, they responded by threatening Plaintiff with legal action for raising and addressing the issue.

86.    As of the date of this filing, not a single insider loan issued among the affiliated entities has been repaid. All such loans, many of which were executed without proper authorization, collateral, or transparency, have fully matured and are now past due. Despite representing these transactions as legitimate loans between enterprise-controlled entities, Defendants have failed to enforce repayment or disclose any formal repayment schedules, confirming that the loans were merely a mechanism to divert and retain control over enterprise assets while denying Plaintiff access to both principal and interest benefits.

87.    In February 2025, Defendants closed the last remaining business bank account accessible to Plaintiff, an account held by SSP. Upon closure, the remaining balance of $26,300 (twenty-six thousand three hundred dollars) was not returned to SSP members or retained in trust but was instead transferred to SSG, an entirely separate entity controlled by Heil. Plaintiff received no notice, consent request, or distribution from this transfer. The funds were absorbed under Heil's personal control through SSG, despite SSP and SSG being legally distinct entities with no valid basis for commingling funds. This final act of misappropriation, executed at the end of a years long exclusion campaign, underscores the ongoing and systematic nature of the racketeering scheme. It was designed to conceal profits, eliminate traceability, and deprive

Plaintiff of his rightful distributions through a coordinated pattern of self-dealing and fraudulent transfers.

(See Exhibit S – February 2025 SSP Account Closure and Transfer Record Showing $26,300.03 to SSG).

88.    In addition to the conduct described above, Defendants' pattern of racketeering activity is further illustrated by their acquisition of high-value personal assets, including multiple private aircraft, a yacht, and over a half dozen exotic automobiles.  Defendant Heil also resides on a residential compound with an estimated value at over $5,000,000 (five million dollars), equipped with a private tennis court and luxury amenities, all acquired during the same period in which the scheme was active. These assets were titled under affiliated shell entities and not disclosed to Plaintiff or co-investors. While the precise source of funds remains concealed, the timing, scale, and structure of these acquisitions strongly suggest the use of enterprise-derived proceeds for personal enrichment.

89.    Defendant Heil and his affiliated entities have been named in multiple lawsuits filed in various states for breach of contract, loan defaults, conspiracy and financial misrepresentations. These lawsuits, many of which involve similar financial conduct and undisclosed liabilities, underscore a broader, multi-jurisdictional pattern of misconduct consistent with the scheme alleged herein. (See Exhibit Q – Alpine loan default by DH)

90.    The events and financial transactions described above were not isolated or incidental. Rather, they formed part of an intentional, sustained racketeering enterprise coordinated by the Defendants, involving repeated misconduct, concealment, and the strategic

use of affiliated entities to eliminate Plaintiff's ownership and access to jointly developed assets.

91.     Defendants operated through an enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of an association-in-fact led and directed by Heil, together with Wait and Defendant Nick Good, and carried out through a network of affiliated entities including SSG, DHV, and ANG. Heil functioned as the principal decision-maker and architect of the enterprise, exercising control through DHV and SSG. Wait acted as a recruiting partner within SSG, facilitating enterprise actions and lending operational legitimacy. Nick Good exercised parallel authority through ANG, approving and executing transactions that advanced the scheme. These entities served as instrumentalities of the enterprise rather than independent actors. The enterprise shared a common purpose to misappropriate jointly owned assets, launder enterprise proceeds, conceal financial activity, and permanently divest Plaintiff of equity, control, and lawful economic interests. It operated with a defined structure, recurring personnel, and continuity of conduct across multiple jurisdictions, including Florida, Minnesota, Texas, and Utah.

92.     The racketeering activity described herein demonstrates both closed-ended and open-ended continuity. From at least 2019 through 2025, Defendants engaged in ongoing predicate acts including wire fraud, bank fraud, obstruction of justice, and money laundering that was executed through affiliated entities and recurring schemes. These acts were not isolated incidents, but formed a consistent pattern of conduct, aimed at perpetuating control over the enterprise and suppressing Plaintiff's rights. The continued operation of these entities and concealment of financial transfers illustrate a threat of continued criminal activity sufficient to establish open-ended continuity under the RICO statute.

93.    As a direct and proximate result of Defendants' racketeering activity, Plaintiff suffered tangible injury to his business and property, including the loss of equity, distributions, and control over assets he helped develop and manage. Plaintiff would not have been deprived of these interests but for the coordinated fraudulent conduct, unauthorized transfers, and concealment efforts executed by Defendants. These injuries are specific, quantifiable, and directly caused by Defendants' pattern of racketeering acts, as defined under 18 U.S.C. § 1964(c)

94.    These facts give rise to the causes of action detailed below, each of which is supported by direct evidence of financial misconduct, intentional exclusion, and unlawful enterprise-level coordination.

## V. Tolling of Statute of Limitations Under the Discovery Rule

87.    Plaintiff did not become aware of the full scope of Defendants' racketeering scheme until 2022 through 2023, during discovery in related litigation initiated by SSTB. Although Plaintiff had been excluded from management and financial access beginning in 2019, the internal documents necessary to establish Defendants' deliberate coordination, asset misappropriation, and self dealing were concealed until that proceeding. Among the most critical disclosures were property appraisals showing that Defendants transferred jointly owned assets to related entities at less than half their actual value. These appraisals had been withheld during a prior AAA arbitration involving GSSTB, during which Heil knowingly misrepresented the value of the properties. Plaintiff ultimately prevailed in that arbitration but was unable to collect damages due to Defendants' fraudulent concealment of this material evidence.

Defendants' concealment did not end in 2023, as they continued to restrict Plaintiff's access to enterprise finances and records, including removing Plaintiff from all remaining bank account access in or about February 2025 and forcing Plaintiff to initiate additional legal action as recently as November 2025 to obtain records that Defendants continued to withhold. These acts of concealment and exclusion prevented Plaintiff from reasonably discovering the full scope and continuing nature of the racketeering enterprise until well within the limitations period. Accordingly, the statute of limitations is tolled under the federal discovery rule and applicable equitable tolling doctrines. Defendants affirmatively concealed their misconduct by deleting email accounts and financial records, submitting false certifications to lenders regarding title and litigation status, routing funds through insider controlled entities, and restricting Plaintiff's access to bank accounts and transactional information, thereby preventing Plaintiff from discovering the full scope of the scheme until discovery in related proceedings.

## CAUSES OF ACTION

88.    Plaintiff brings this action for damages and equitable relief against Defendants based on their coordinated conspiracy and execution of a multi year scheme to defraud Plaintiff of ownership interests, economic benefits, and enterprise assets. Defendants carried out this scheme through a pattern of racketeering activity consisting of predicate acts of wire fraud, bank fraud, mail fraud, money laundering, obstruction of justice, and interstate travel in aid of racketeering, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a) through (d), and other applicable federal law.

## COUNT I

## VIOLATION OF 18 U.S.C. § 1962(a)

(Investment of Income Derived from Racketeering Activity in an Enterprise Engaged in

Interstate Commerce)

Against All Defendants

89. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully
set forth herein.

90. Defendants engaged in a long-running, coordinated scheme of racketeering activity,
using their positions within various business entities to misappropriate funds, falsify records, and
conceal illicit transactions. This activity included repeated violations of federal law, including
wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), bank fraud (18 U.S.C. § 1344),
honest services fraud (18 U.S.C. § 1346), obstruction of justice (18 U.S.C. §§ 1503, 1512), and
interstate travel in aid of racketeering (18 U.S.C. § 1952). These acts were committed for the
common purpose of enriching Defendants at Plaintiff's expense and eliminating his ownership
and economic interests in multiple enterprises.The predicate acts underlying this scheme are pled
with particularity in the factual allegations above and in Appendix A, attached hereto and
incorporated by reference, which identifies the approximate dates, transactions or
communications, financial institutions or recipients, and the role of each Defendant. Plaintiff's
injury did not arise solely from the predicate acts themselves, but from Defendants' subsequent
investment of racketeering proceeds into insider-controlled assets, which permanently converted
Plaintiff's equity into properties and enterprises from which he was excluded.

91. The proceeds from these unlawful acts were funneled through a network of shell
companies and related entities to disguise their origin, ownership, and control. These proceeds
that were generated through fraudulent property sales, unauthorized wire transfers, and
misrepresentations to financial institutions were reinvested into Defendants' ongoing business

45

operations to expand and sustain the racketeering enterprise. Defendants' reinvestment of racketeering proceeds into new insider-controlled acquisitions caused Plaintiff distinct injury by permanently converting his equity into properties from which he was excluded, separate from the initial acts of wire fraud, bank fraud and related predicate offenses. Representative predicate acts include the following:

a. Wire Fraud (18 U.S.C. § 1343) Defendants caused structured wire transfers across multiple accounts and entities to divert funds and conceal the origin and control of racketeering proceeds. Examples include the August 2023 transfers exceeding $3,000,000 (three million dollars) among SSG, UBL, and GSSHH (Exhibit A), and the $427,351 (four hundred twenty-seven thousand three hundred fifty-one dollars) transfer from SSL to Heil's personal account in April 2020 (Exhibit T). Additional transactions, including transfers of $602,000 (six hundred two thousand dollars) in February 2019 (Exhibit C), $111,000 (one hundred eleven thousand dollars) in April 2020 (Exhibit R), and $70,000 (seventy thousand dollars) in November 2022 (Exhibit U), were similarly routed through accounts controlled by Heil, further demonstrating the scope and continuity of the wire fraud scheme.

In furtherance of the same wire fraud scheme, on or about August 23, 2023, Defendant Heil caused a $1,500,000 (one million five hundred thousand dollars) transfer of enterprise funds from SSL to UBL  pursuant to a purported loan agreement. Heil, acting through affiliated entities under his control, executed the transaction on both sides as the authorized representative of the lender and the borrower. The transaction was structured without disclosure to Plaintiff, without collateral, without personal guarantees, and at a below-market interest rate, and was routed through interstate banking channels to

46

conceal the true nature, purpose, and control of the transfer. The loan has since matured and remains unpaid, confirming that it functioned as a sham transaction designed to divert and launder enterprise proceeds rather than as a bona fide arm's-length loan. These acts constitute wire fraud in violation of 18 U.S.C. § 1343. (See Exhibit N).

b. Bank Fraud (18 U.S.C. § 1344) In November 2022, Defendant Heil executed and notarized a mortgage document on behalf of SSTB in favor of Synovus Bank. The document falsely certified that there were no issues concerning title, no pending claims or disputes over ownership, and no encumbrances affecting the property. Heil was fully aware that the property was subject to an active lawsuit and lis pendens filed by Plaintiff beginning in 2021, which remained pending through 2024. This notarized statement was materially false and designed to induce the lender to rely on the apparent clarity of title in extending financing. Deposition testimony establishes that Heil executes legal documents on behalf of approximately 25 properties per year, demonstrating that the false certification reflected a repeated practice rather than an isolated error. (See - Exhibit B - SSTB Mortgage Certification to Synovus)

c. Mail Fraud (18 U.S.C. § 1341) The false mortgage certification described above was executed and notarized in the State of Minnesota and then transmitted via mail or commercial carrier to a Florida based title company or closing agent in connection with the Synovus Bank transaction. The use of the mail was essential to completing the transaction, as the original document was required to be recorded in the public land records of the relevant Florida county. This act of mailing a materially false document in furtherance of the scheme constitutes a predicate act of mail fraud. (See Exhibit B)

d. Obstruction of Justice (18 U.S.C. §§ 1503, 1512) Defendant Heil obstructed arbitration and litigation proceedings by concealing material evidence, destroying internal records, and providing materially false sworn testimony under oath. During AAA arbitration in July 2021, Heil falsely testified that the 12501 and 13001 Belcher Road properties were not worth more than the values for which they had been transferred, despite the fact that both properties had been appraised by Heil's entities prior to that testimony at more than double those amounts, as later revealed through discovery in the SSTB litigation. In furtherance of this obstruction, and during a period in which disputes had escalated and arbitration and litigation were reasonably foreseeable, Heil caused the deletion of Plaintiff's enterprise email account and related internal communications, thereby eliminating records documenting asset valuations, financial transfers, and internal decision making relevant to the proceedings. In sworn deposition testimony, Heil admitted that administrators under his control "killed" Plaintiff's email account as part of a coordinated "clean sweep," resulting in the deletion of the account with no archives while Defendants retained administrator level control over the system. In addition, during a deposition in April 2025, Heil falsely testified that he had made only one transfer out of company funds, when in fact multiple such transfers were made and are well documented, and he further misrepresented the ownership structure of SSSW and falsely denied having control over the entity at the outset of the deposition, statements that were later contradicted by Heil's own testimony as the deposition progressed. These false sworn statements, internal contradictions, and acts of record destruction were not accidental but constituted calculated efforts to mislead Plaintiff, suppress material evidence, and obstruct Plaintiff's ability to trace and recover misappropriated assets.

48

e. Interstate Travel in Aid of Racketeering (18 U.S.C. § 1952) Defendant Heil coordinated racketeering acts across multiple states and jurisdictions. During his April 2025 deposition, Heil participated remotely from Aruba while giving false sworn testimony regarding ownership, control, and financial transfers. He also executed the fraudulent mortgage referenced above in Minnesota for a Florida property and caused the document to be mailed for recording in Florida. Defendants intentionally structured their operations across Florida, Texas, Utah, and Minnesota to avoid detection, complicate enforcement, and prevent accountability under state law. This multistate arrangement has shielded them from legal repercussions thus far and has necessitated Plaintiff's resort to federal RICO enforcement.

f. Extortion (18 U.S.C. § 875(d)) In April 2022, while litigation with SSTB was pending, Defendant Heil issued an email demanding a $400,000 (four hundred thousand dollars) "settlement" from Plaintiff within 48 hours. The message threatened to "chain up the doors" on assets held by Plaintiff under Upstate Holdings, LLC and warned that any transfers would be deemed "fraudulent." This threat was issued without legal authority, in the context of active litigation, and was plainly intended to intimidate Plaintiff into surrendering his legal rights and economic interests. The use of interstate communication to threaten harm to property and coerce payment constitutes extortion under 18 U.S.C. § 875(d) and further supports the pattern of racketeering conduct alleged herein. (See Exhibit Z)

92. Through these acts, Defendants knowingly and willfully engaged in racketeering activity and reinvested the proceeds into their ongoing enterprise to expand their control, sustain

illicit business operations, and avoid liability. These actions constitute direct violations of 18 U.S.C. § 1962(a).

## COUNT II

## VIOLATION OF 18 U.S.C. § 1962(b)

(Acquisition or Maintenance of an Interest in an Enterprise Through Racketeering Activity)

Against All Defendants

93. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94. Defendants have engaged in a sustained pattern of racketeering activity with the intent to illegally acquire and maintain control over jointly owned businesses and assets. Through fraudulent transactions, falsified records, self-dealing, and intentional concealment, Defendants acquired and maintained control over enterprise assets through fraudulent transfers, false lender certifications, and the concealment of material financial information, thereby eliminating Plaintiff's ability to monitor, veto, or recover misappropriated funds across multiple jurisdictions. The racketeering acts through which Defendants acquired and maintained control over the enterprise are pled with particularity in the factual allegations above and in Appendix A, which identifies the approximate dates, transactions or communications, affected entities or assets, and the role of each Defendant.

95. By unlawfully removing Plaintiff from decision-making and access to financial accounts, Defendants ensured he could not monitor, object to, or recover diverted enterprise proceeds. These acts were part of a broader scheme to consolidate financial control, suppress rightful claims of ownership, and shield the enterprise from exposure.

96. Examples of this conduct include:

a. April 2020 – Transfer of $427,351 (four hundred twenty-seven thousand three hundred fifty-one dollars) from SSL to Heil's Personal Account: Defendants caused $427,351 (four hundred twenty-seven thousand three hundred fifty-one dollars) to be transferred from SSL to Heil's personal bank account without Plaintiff's knowledge, consent, or any legitimate business purpose. The transfer occurred while Plaintiff was excluded from management, and the funds were diverted for Heil's personal benefit. (See Exhibit T.)

b. April 2020 – Transfer of $111,000 (one hundred eleven thousand dollars) from GSSTB to Heil's Personal Account: Shortly after the sale of the 13001 Belcher Road property, GSSTB received sale proceeds but Defendants diverted $111,000 (one hundred eleven thousand dollars) directly to Heil's personal account. The transaction was executed during active litigation involving related property transfers and without Plaintiff's approval. (See Exhibit R.)

c. August 2023 – Structured Wire Transfers Exceeding $3,000,000 (three million dollars): Defendants engaged in a complex series of wire transfers exceeding $3,000,000 (three million dollars) among affiliated entities including SSG, UBL, and GSSHH. These transactions were designed to obscure ownership, avoid discovery, and retain control over misappropriated enterprise assets. (See Exhibit A.)

97. Plaintiff will present additional examples of unauthorized transfers, ownership manipulations, and coordinated acts of financial concealment at trial, all of which were undertaken to eliminate his role, access, and rights within the enterprise.

98. Through these and other related acts, Defendants knowingly violated 18 U.S.C. § 1962(b) by acquiring and maintaining an interest in and control over the enterprise through a pattern of racketeering activity.

## COUNT III

## VIOLATION OF 18 U.S.C. § 1962(c)

(Conducting or Participating in an Enterprise Engaged in Racketeering Activity)

Against All Defendants

99. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100. Defendants orchestrated, directed, and participated in a criminal enterprise that engaged in a pattern of racketeering activity for the purpose of defrauding Plaintiff, misappropriating business assets, and concealing illicit financial transactions. Using fraudulent wire transfers, falsified loan documents, insider deals, and obstruction of justice, Defendants excluded Plaintiff from the management and profits of jointly owned businesses and unlawfully enriched themselves. The racketeering acts through which Defendants conducted and participated in the affairs of the enterprise are pled with particularity in the factual allegations above and in Appendix A, attached hereto and incorporated by reference, which identifies the approximate dates, transactions or communications, affected entities, and the role of each Defendant.

101. The enterprise functioned through an interconnected network of shell companies, manipulated accounts, and insider-controlled entities. Its operations were designed to disguise unauthorized transfers, obscure ownership interests, and deprive Plaintiff of both financial and

decision-making rights in the enterprise. Defendants repeatedly engaged in conduct that directly violated 18 U.S.C. § 1962(c) by using the enterprise to carry out acts of racketeering.

102. Each Defendant knowingly participated in the affairs of the enterprise through one or more racketeering acts. Heil executed and directed unauthorized transfers, signed and managed over seventy-five LLCs involved in the fraudulent scheme, and misrepresented material facts under oath. Other Defendants, including those affiliated with SSG, UBL, and Gator State Storage entities, facilitated, authorized, or benefited from improper transactions, including the execution of fraudulent loan documents, structured wire transfers, and financial concealment.

103. The predicate acts constituting the pattern of racketeering activity include:

I. Wire Fraud (18 U.S.C. § 1343)

Defendants executed a series of unauthorized wire transfers across related entities to divert and launder funds:

In August 2023, over $3,000,000 (three million dollars) was transferred among SSG, UBL, and GSSHH (Exhibit A). These transactions were intentionally structured to avoid detection, prevent Plaintiff from recovering misappropriated assets, and conceal the source and ownership of funds.

Funds derived from the sale of business properties were routed through multiple layers of insider-controlled entities, further evidencing intent to defraud and conceal.

II. Bank Fraud (18 U.S.C. § 1344):

A. Synovus Bank Fraud (November 2022)In November 2022, Defendants submitted a mortgage application and related certifications to Synovus Bank falsely stating that there were no title disputes or pending litigation involving the collateralized property located at 12501 S Belcher Road, Largo, Florida, despite

an active lis pendens filed by Plaintiff in June 2021 and an ongoing civil action naming Defendant Heil individually, along with SSG and ANG Equity Holdings, LLC, pending in the Circuit Court for Palm Beach County, Florida. This false certification was material to Synovus Bank's decision to extend financing and constitutes a predicate act of bank fraud in violation of 18 U.S.C. § 1344. (See Exhibit B)

### B. Pattern of Misrepresentations to Financial Institutions

The Synovus fraud was not an isolated incident. During deposition testimony in April 2025, Defendant Heil admitted that he personally executes loan documents and financial certifications on behalf of approximately 25 properties per year across multiple states. The enterprise acquired, financed, or refinanced dozens of properties between approximately 2019 and 2025 through federally insured financial institutions located in Florida, Minnesota, Wisconsin, Texas, Utah, North Carolina, Virginia, Missouri, and other states.

As alleged throughout this Complaint, Defendants routinely concealed material information from Plaintiff and other equity holders, including pending litigation, title disputes, ownership interests, and the source and use of enterprise funds. The Synovus false certification exemplifies the manner and means by which Defendants misrepresented material facts to financial institutions in order to obtain financing, launder proceeds, and expand the racketeering enterprise.

These acts demonstrate a pattern of bank fraud within the meaning of 18 U.S.C. §§ 1344 and 1961(1), satisfying the relationship and continuity requirements of RICO.

III. Money Laundering (18 U.S.C. § 1956):

Defendants knowingly conducted and attempted to conduct financial transactions involving proceeds of specified unlawful activity, including wire fraud and bank fraud, with the intent to conceal and disguise the nature, source, ownership, and control of racketeering proceeds. One such transaction was the $1,500,000 (one million five hundred thousand dollars) insider "loan" from SSL to UBL (Exhibit N), which was executed without notice to Plaintiff and structured without collateral, personal guarantees, recourse, or market-based terms. The loan has fully matured and remains unpaid, confirming it was never intended to operate as a legitimate extension of credit. The proceeds were thereafter recycled through affiliated entities controlled by Defendants in a manner designed to obscure their origin, promote the continuation of the racketeering enterprise, and deny Plaintiff any economic benefit or participation.

IV. Extortion (18 U.S.C. § 875(d))

In April 2022, Heil sent Plaintiff a written communication demanding a $400,000 (four hundred thousand dollars) "settlement" within 48 hours. The message threatened to "chain up the doors" on assets held by Plaintiff under Upstate Holdings, LLC and warned that any transfer of those assets would be met with legal action for "fraudulent transfer." It further claimed over $900,000 (nine hundred thousand dollars) in "documented" losses and stated that all attorneys' fees would be pursued if payment was not made. The message concluded with the directive: "Govern yourself accordingly." This communication was made during active litigation and lacked any lawful basis. It was plainly intended to intimidate Plaintiff into surrendering his rights and constituted a threat to injure property made with the intent to extort money. This act qualifies as extortion

under 18 U.S.C. § 875(d) and serves as an additional predicate act of racketeering. (See Exhibit Z)

104. The racketeering enterprise consisted of both core operators and secondary facilitators who collectively executed the fraudulent scheme. The core operators (enterprise leadership) included Heil, David W. Heil, Wait, SSG, DHV, and ANG. These individuals and entities directed and controlled the enterprise's financial and operational misconduct.

105. The secondary facilitators and affiliated entities included GSSBB, GSSHH, GSSLW, UBL, CC, CGV, and other individuals and affiliated shell companies used to conceal financial transactions, authorize fraudulent loans, or launder misappropriated funds.

106. Through their repeated participation in the conduct of an enterprise engaged in racketeering activity, Defendants have violated 18 U.S.C. § 1962(c).

## COUNT IV

## VIOLATION OF 18 U.S.C. § 1962(d)

(Conspiracy to Commit Racketeering Offenses)

Against All Defendants

107. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108. Defendants knowingly and willfully conspired to conduct and participate, directly and indirectly, in the affairs of a racketeering enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). This agreement included coordinated acts of wire fraud, bank fraud, money laundering, obstruction of justice, and the fraudulent concealment of assets and corporate control. The racketeering acts through which Defendants conducted and participated in the affairs of the enterprise are pled with particularity in the factual allegations

above and in Appendix A, attached hereto and incorporated by reference, which identifies the approximate dates, transactions or communications, affected entities, and the role of each Defendant.

109. As part of the conspiracy, Defendants engaged in coordinated acts of financial fraud, misappropriation, and intimidation, including issuing threats intended to coerce Plaintiff into abandoning his legal rights. In April 2022, Heil issued a written demand for a $400,000 (four hundred thousand dollars) "settlement" accompanied by threats to seize control of Plaintiff's business assets if the payment was not made. This act constitutes attempted extortion in violation of 18 U.S.C. § 875(d) and was executed as part of the broader racketeering enterprise. The inclusion of extortion among the enterprise's tactics further demonstrates the knowing agreement among Defendants to engage in unlawful conduct to maintain control and suppress opposition. (See Exhibit Z)

110. Each Defendant agreed to further the objectives of the criminal enterprise and played a role in advancing its scheme to misappropriate jointly owned assets, defraud financial institutions, and exclude Plaintiff from control and economic benefit. Each Defendant knowingly agreed that at least one member of the conspiracy would commit multiple acts of wire fraud, bank fraud, and money laundering in furtherance of the enterprise, and that such acts would affect interstate commerce.

111. The conspiracy involved the coordinated use of insider-controlled LLCs to conceal ownership and financial activity; the execution of self-dealing loans such as the $1,500,000 (one million five hundred thousand dollars) transfer from SSP to UBL (Exhibit N); structured wire transfers exceeding $3,000,000 (three million dollars) among affiliated entities in August 2023 (Exhibit A); and false certifications in mortgage documents submitted in November 2022 to

Synovus Bank while litigation remained pending (Exhibit B). Heil is listed as signatory or managing member on no fewer than 75 limited liability companies, several of which were used to transfer or obscure assets during the racketeering scheme. At least a dozen of these entities are directly implicated in the frauds and property transfers described in this action. In July 2019, prior to the unauthorized removal of Plaintiff's ownership interests in the properties, Defendants Heil, ANG, Wait, and others participated in an internal email chain explicitly discussing a coordinated plan to remove Plaintiff while limiting what could be said in writing. Several participants cautioned against written documentation and advised handling critical discussions only by phone. This email chain evidences a clear agreement to carry out unlawful actions in secret and serves as a direct written record of the RICO conspiracy. The insider loans and wire transfers referenced herein have since fully matured, remain unpaid, and are in default, further proving that the transactions were never intended to be legitimate and were executed solely to enrich enterprise insiders while concealing their financial misconduct. (See Exhibit X – July 2019 Email Chain Among Defendants Re: Removal Strategy.) The July 2019 email is just one example of many documents in Plaintiff's possession that will be presented at trial to establish the ongoing nature and breadth of the conspiracy.

112. Defendants took overt acts in furtherance of the conspiracy, including but not limited to signing loan documents that concealed pending litigation and Plaintiff's ownership stake; executing wire transfers designed to obscure the origin and destination of proceeds; falsifying corporate records and financial disclosures; and transferring funds between insider-controlled shell entities without authorization.

113. While not all Defendants personally committed every act, each knowingly agreed to facilitate or conceal the enterprise's racketeering objectives and benefitted from the enterprise's

operations. Defendants were aware of the essential nature of the plan and agreed to facilitate its success.

114. The unlawful conspiracy persisted from at least 2019 through the present, continuing through active litigation, and remained in effect through structured property sales, insider financial deals, and the closing of company accounts to obstruct oversight. Additional acts in furtherance of the conspiracy will be proven at trial.

115. Through these coordinated actions and agreements, Defendants violated 18 U.S.C. § 1962(d) by conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity.

116. One or more Defendants were aware of the fraudulent conduct described herein but failed to report the criminal activity to the appropriate authorities. Instead, they actively concealed the scheme by withholding documents, providing misleading information, and allowing unlawful transactions to continue. Such conduct constitutes misprision of a felony under 18 U.S.C. § 4 and supports additional liability under the RICO conspiracy statute.

117. Additional Defendants participated in the continuation and concealment of the enterprise's racketeering activity after key fraudulent acts had already been committed. These individuals obscured the true nature of financial transfers, falsified post-transaction documents, and helped shield principal perpetrators from scrutiny. Under 18 U.S.C. § 3, they are liable as accessories after the fact for knowingly assisting in the concealment and laundering of enterprise proceeds.

118. Several Defendants, while not serving as primary architects of the fraudulent scheme, knowingly provided material support to its execution. These acts included facilitating wire transfers, signing off on fraudulent loans, transferring misappropriated funds, and enabling

unauthorized property transfers. Such individuals are liable under 18 U.S.C. § 2 for aiding and abetting the commission of predicate offenses, including wire fraud, bank fraud, and obstruction of justice.

## COUNT V

Fraud, Deception, and Interference with Business Relations

Against All Defendants

119. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

120. Defendants deliberately and maliciously interfered with Plaintiff's business relationships, engaging in fraudulent property transactions, financial obfuscation, and deceptive corporate maneuvers to systematically exclude Plaintiff from financial benefits and business opportunities. Through a carefully orchestrated scheme, Defendants manipulated ownership records, concealed material financial information, and obstructed Plaintiff's ability to participate in legitimate business dealings, ensuring that Plaintiff was effectively cut out of all decision-making, financial distributions, and equity participation. The fraudulent and deceptive acts underlying this claim are pled with particularity in the factual allegations above and in Appendix A, attached hereto and incorporated by reference, which identifies the approximate dates, transactions, affected entities, and the role of each Defendant in the scheme to interfere with Plaintiff's business relationships.

121. As part of this calculated and unlawful interference, Defendants brought in third-party buyers, investors and new members—including those added to SSTB, TXB, and

related subsidiaries before and during the process of removing Plaintiff's ownership interests. Defendants' conduct was directed not merely at breaching internal agreements, but at inducing third parties and affiliated entities to participate in transactions that severed Plaintiff's existing and prospective business relationships. These individuals and entities were knowingly involved in the acquisition of enterprise assets at prices far below fair market value, some exceeding 50% discounts. Given the public record of Plaintiff's involvement, the nature of the disputes, and the discrepancies in valuation, these participants were or should have been aware of Plaintiff's ownership rights and the impropriety of the transactions. Their involvement directly contributed to the success of Defendants' scheme and deprived Plaintiff of lawful equity and participation.

122. Defendants took active and deliberate steps to obstruct Plaintiff's involvement in business operations and financial transactions. In July 2019, Plaintiff was removed from access to company bank accounts, eliminating his ability to monitor enterprise finances. Shortly thereafter, Defendants facilitated the transfer of key properties—specifically, the Largo properties to SSTB, and the Lubbock properties to TXB. These transactions were orchestrated while Heil and ANG maintained ownership stakes in the acquiring entities, further illustrating the self-dealing nature of the transfers. Proceeds were diverted to shell entities under Defendant control, bypassing Plaintiff entirely and consolidating control and benefit among the co-conspirators.

123. Through these fraudulent and deceptive actions, Defendants intentionally interfered with Plaintiff's business relationships and financial interests. Their conduct was not incidental or merely negligent, but part of a deliberate and coordinated scheme to exclude Plaintiff from business operations, divert funds, and mislead third parties about ownership and control. As a direct result, Plaintiff suffered severe financial loss, reputational damage, and loss of future

opportunities. Defendants' misconduct warrants compensatory and punitive damages and such further relief as the Court deems just and proper.

## **COUNT VI**

Unjust Enrichment (Equitable Claim)

Against All Defendants

124. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

125. Defendants have knowingly, willfully, and unlawfully enriched themselves at Plaintiff's expense by misappropriating business assets, fraudulently diverting funds, and systematically transferring the valuable assets held by entities in which Plaintiff maintained a membership interest. Although Plaintiff retained formal ownership rights in various LLCs, Defendants stripped these entities of their value by orchestrating fraudulent property sales, concealed financial transactions, and insider asset transfers leaving Plaintiff's ownership interests effectively hollow. The transactions and conduct giving rise to Defendants' unjust enrichment are set forth in the factual allegations above and in Appendix A, attached hereto and incorporated by reference, which identifies the approximate dates, transfers, entities involved, and the benefits unjustly retained by Defendants.

126. Defendants' conduct resulted in substantial and unjust financial gain. They profited from property sales, self-dealing loans, and business revenues while excluding Plaintiff from distributions, corporate rights, and economic control. This unjust enrichment was not incidental but the result of a calculated scheme to divert both equity and income into entities exclusively controlled by Defendants.

127. The following actions demonstrate Defendants' unlawful enrichment at Plaintiff's expense:

a. Misappropriation of Sale Proceeds and Equity in Properties: Defendants caused the transfer of valuable real estate, including the Lubbock and Largo properties, from LLCs in which Plaintiff holds membership interests to new entities under their exclusive control. These transactions were made without fair valuation, adequate compensation, or required member approval. In April 2020, $427,351 (four hundred twenty-seven thousand three hundred fifty-one dollars) was diverted from SSL to David Heil's personal account (see Exhibit T), and $111,000 (one hundred eleven thousand dollars) was similarly transferred from GSSTB following the sale of the Largo property (see Exhibit R). Although Plaintiff remained an owner on paper, these sales and transfers effectively erased the economic value of his interests by liquidating LLC assets and diverting proceeds to Defendants.

b. Insider Loan Transactions: Defendants executed a series of unauthorized loans between affiliated entities without notice or consent. These included a $1,500,000 (one million five hundred thousand dollars) non-collateralized loan from State Storage Palmetto, LLC to UBL (see Exhibit N), signed by affiliated parties on both sides of the transaction. Loan proceeds were used to fund related entities while excluding Plaintiff from both principal and interest benefits. The loan has since fully matured and remains unpaid, further evidencing that it was never intended to be a legitimate financial arrangement but rather a mechanism to divert and retain enterprise assets for the benefit of insiders.

c. Diversion of Corporate Revenues: Structured wire transfers exceeding $3,000,000 (three million dollars) were routed between Defendant-controlled entities in August 2023 (see Exhibit A), designed to obscure the movement of funds and bypass any corporate distributions to Plaintiff. These transfers were executed as purported loans or investments without Plaintiff's knowledge or consent. None of the funds have been repaid, and all of the so-called loan arrangements have since matured, further confirming that the transactions were part of a deliberate effort to strip Plaintiff of his rightful share and convert enterprise assets for insider benefit.

d. Equity Gains from Misappropriated Funds: In 2022 and 2023, Defendants used unlawfully diverted enterprise funds to acquire two large commercial properties in Utah through UBL. Although the $1,500,000 (one million five hundred thousand dollars) in capital used was framed as a loan from SSP, it was never repaid and has since matured. Defendants used these misappropriated funds to generate substantial equity in the acquired properties while excluding Plaintiff from all ownership and financial benefit. According to financial statements provided by Heil to lenders to obtain financing, the equity in these properties now exceeds $25,000,000 (twenty-five million dollars). Plaintiff will provide these representations and the resulting enrichment through discovery and documentary evidence. The acquisitions could not have occurred without the use of enterprise funds diverted from Plaintiff's rightful share, for which Plaintiff is entitled to a proportionate financial interest.

128. In addition, Defendants were unjustly enriched through the same diversion of enterprise funds with respect to multiple Florida based self-storage properties held by insider controlled entities. As alleged in the Factual Background, Defendants used diverted proceeds

from SSP to retire bridge financing, stabilize assets, and create or preserve substantial equity in Utah and Florida properties while excluding Plaintiff from ownership, distributions, and control. Defendants have retained the resulting equity appreciation, refinancing benefits, and operating income, all of which were obtained through the misuse of enterprise funds in which Plaintiff held a direct ownership interest. It would be inequitable for Defendants to retain these benefits without restitution to Plaintiff.  Plaintiff will present additional evidence of unjust enrichment at trial, including internal emails, bank records, and corporate filings. These documents will show a consistent pattern of financial extraction from shared enterprises, enriching Defendants at Plaintiff's direct expense.

129. As a result of Defendants' wrongful conduct, they have been unjustly enriched and must be required under equitable principles to return the misappropriated funds, restore Plaintiff's financial interests, and account for all benefits derived from improperly retained equity and assets.

## COUNT VII

Breach of Fiduciary Duty

Against Defendants Heil, SSG, ANG, and DHV

130. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein. This Count is brought against those individuals and entities who held fiduciary duties toward Plaintiff by virtue of their control over jointly owned business entities, financial accounts, and shared assets. Defendants Heil, SSG, ANG, and DHV each owed Plaintiff duties of loyalty, transparency, and good faith in managing operations and handling business assets.

131. Defendants Heil, SSG, ANG, and DHV owed Plaintiff fiduciary duties of loyalty, honesty, and good faith in the management of jointly owned business entities, financial accounts, and corporate transactions. As co-owners, business partners, and persons in control of financial operations, these Defendants were obligated to act in Plaintiff's best interests, to avoid self-dealing, and to disclose material information relating to shared ventures.

132. Instead, Defendants knowingly and willfully breached these fiduciary duties by engaging in a pattern of misrepresentation, diversion of corporate assets, and exclusionary control over finances and operations. Their misconduct included unauthorized transfers, concealment of material information, and manipulation of corporate documents for personal enrichment. The transactions and conduct constituting these fiduciary breaches are set forth in the factual allegations above and in Appendix A, attached hereto and incorporated by reference, which identifies the approximate dates, affected entities, transfers, and actions through which Defendants diverted assets and concealed material information.

133. Defendants misappropriated funds held by companies in which Plaintiff maintained ownership interests and concealed the financial consequences of real estate sales and internal lending arrangements. They transferred proceeds from corporate accounts into personal accounts and affiliated entities, often without notice, consent, or appropriate accounting.

134. In one instance, $427,351 (four hundred twenty-seven thousand three hundred fifty-one dollars) was diverted from SSL in April 2020 to Heil's personal account (see Exhibit T). Another $111,000 (one hundred eleven thousand dollars) was transferred in April 2020 from GSSTB to Heil's personal account following the Largo property sale (see Exhibit R). Each transaction deprived Plaintiff of rightful financial participation and occurred while Plaintiff was excluded from access and oversight.

135. Defendants also engaged in unauthorized insider lending, including a $1,500,000 (one million five hundred thousand dollars) non-collateralized loan from SSL to UBL (Exhibit N), signed by entities controlled by the same individuals. These loans and other transactions were designed to divert profits and remove capital from shared ventures to related parties. This is just one of several such insider lending arrangements that Plaintiff will cite at trial, supported by loan documents, email correspondence, and financial records demonstrating a consistent pattern of self-dealing and misuse of control.

136. Defendants manipulated financial records, obscured accounting entries, and misrepresented ownership rights and profit entitlements to third parties in furtherance of their scheme. Plaintiff was deliberately excluded from distributions and corporate communications, despite having equity stakes in the affected entities.

137. Through these actions, Defendants breached their fiduciary duties to Plaintiff. Their conduct was intentional, malicious, and undertaken for personal gain at Plaintiff's expense.

138. As a direct result of these breaches, Plaintiff suffered substantial financial losses, reputational harm, and ongoing economic injury. Plaintiff seeks compensatory, treble, and punitive damages, which will be set forth in the Prayer for Relief and proven at trial through financial documentation and testimony.


## **PRAYER FOR RELIEF**


WHEREFORE, Plaintiff UPSTATE HOLDINGS, LLC respectfully requests that this Court enter judgment in its favor and grant the following relief against Defendants Heil, SSG,

ANG, DHV, and all other named Defendants and affiliated entities as pleaded herein (collectively, "Defendants"), jointly and severally:

**A. DAMAGES**

1. Compensatory and Statutory Damages

Plaintiff seeks an award of compensatory damages in an amount to be proven at trial, but not less than $12,822,200 (twelve million eight hundred twenty-two thousand two hundred dollars), based on the categories of financial harm resulting from Defendants' fraudulent and racketeering conduct as set forth herein. Pursuant to 18 U.S.C. § 1964(c), Plaintiff further seeks treble damages, such that Defendants are liable for no less than $38,466,600 (thirty-eight million four hundred sixty-six thousand six hundred dollars) in statutory damages, exclusive of prejudgment interest, attorneys' fees, costs, disgorgement, and equitable relief.

a. Diverted Sale Proceeds – Plaintiff's share of proceeds from the sale of assets, including SSP, which was unlawfully diverted by Defendants. Plaintiff is entitled to not less than $450,000 (four hundred fifty thousand dollars) in misappropriated cash proceeds.

b. Equity Value– Plaintiff's share of equity in affected business entities, including GSSTB and SSL, was rendered worthless or improperly transferred through insider transactions. Plaintiff held a forty percent (40%) ownership interest in SSL, and the total equity value shortfall for that entity is no less than $3,000,000 (three million dollars), based on a formal appraisal and the transfer

price. Plaintiff's proportional share of that loss is therefore no less than $1,200,000 (one million two hundred thousand dollars).

The GSSTB properties were transferred for at least $5,900,000 (five million nine hundred thousand dollars) less than the values Defendant Heil represented to lenders in financial statements prepared and submitted in the ordinary course of seeking credit. Plaintiff held a twenty percent (20%) ownership interest in GSSTB, resulting in an additional equity loss of no less than $1,180,000 (one million one hundred eighty thousand dollars). Plaintiff's combined equity losses therefore total no less than $2,380,000 (two million three hundred eighty thousand dollars), exclusive of treble damages, disgorgement, and equitable relief.

c. Operating Profits – Plaintiff is entitled to a share of operating profits generated during the period of exclusion from corporate access and distributions across. Plaintiff's withheld profit share is not less than $560,000 (five hundred sixty thousand dollars).

d. Misappropriated Funds – Plaintiff is entitled to a proportional recovery of funds diverted by Defendants from jointly held accounts. This includes a minimum of 20% of the $286,000 (two hundred eighty-six thousand dollars) removed from GSSTB, totaling $57,200 (fifty-seven thousand two hundred dollars), and 40% of the $1,200,000 (one million two hundred thousand dollars) diverted from SSL accounts into personal or affiliated accounts controlled by Heil, totaling $480,000 (four hundred eighty thousand dollars). The combined minimum value of these two transactions is $537,200 (five hundred thirty-seven

thousand two hundred dollars). These transactions represent only a portion of the total cash misappropriated, with much larger amounts moved through layered transfers to additional entities under Heil's control. The full extent of these diversions, including layered transactions and affiliated transfers, will be shown further at trial.

e. Diverted Equity Used for Utah Asset Acquisition – Defendants used at least $1,500,000 (one million five hundred thousand dollars) in enterprise funds diverted from SSP, in which Plaintiff held a fifteen percent (15%) ownership interest, to acquire or preserve high value commercial storage properties in Utah through UBL. Based on Defendants' own historical financial statements prepared and submitted to federally insured financial institutions in connection with obtaining financing, the Utah properties reflect equity in excess of $25,000,000 (twenty-five million dollars). Plaintiff seeks recovery of no less than $3,750,000 (three million seven hundred fifty thousand dollars), representing his proportional share of equity wrongfully created, preserved, or enhanced through the diversion of enterprise funds, together with disgorgement of all related income, appreciation, and economic benefits.

f. Diverted equity used for Florida Asset Acquisition - Defendants diverted enterprise funds from SSP to insider controlled Florida entities, including GSSBB, GSSHH, and GSSLW. Based on Defendants' own historical financial statements prepared and submitted to federally insured financial institutions in connection with obtaining financing, the Florida properties reflect equity of no less than $7,000,000 (seven million dollars) at 830 West Industrial Avenue,

Boynton Beach, Florida; no less than $17,500,000 (seventeen million five hundred thousand dollars) at 500 North Haverhill Road, West Palm Beach, Florida; and no less than $9,800,000 (nine million eight hundred thousand dollars) at 900 Barnett Drive, Lake Worth, Florida. Plaintiff seeks recovery of no less than $5,145,000 (five million one hundred forty-five thousand dollars), representing his proportional share of equity wrongfully created, preserved, or enhanced through the diversion of enterprise funds, together with disgorgement of all related income, appreciation, and economic benefits.

2.    Prejudgement Interest:

Plaintiff seeks an award of prejudgment interest on all compensatory damages, calculated from the date each loss was incurred or each unlawful transfer occurred, to fully compensate Plaintiff for the loss of use of his property.

**B. EQUITABLE RELIEF**

1. Injunctive Relief (Preliminary and Permanent):

Enjoining Defendants from engaging in further fraudulent activity, including transferring, selling, or disposing of assets derived from fraudulent transactions; making further misrepresentations to financial institutions or third parties; and destroying, altering, or concealing financial records related to the fraudulent transactions. Plaintiff also seeks an order freezing Defendants' assets to prevent further dissipation while litigation is pending.

2. Forensic Accounting & Full Financial Disclosure:

Appointment of an independent forensic auditor to examine Defendants' financial records, real estate transactions, and corporate holdings. Plaintiff further requests a full accounting of all proceeds, revenues, and profits obtained from fraudulent property sales, insider loans, wire transfers, and concealed corporate activities.

3. Rescission or Equitable Restoration of Fraudulent Transactions:
To the extent permissible, voiding or unwinding fraudulent transfers of corporate assets, properties, or interests made without Plaintiff's knowledge or consent. In the alternative, awarding equitable compensation or restitution sufficient to restore Plaintiff's lost financial and governance positions caused by such transfers.

## C. DECLARATORY RELIEF

Plaintiff requests that the Court enter a judicial declaration that: Defendants engaged in racketeering activity in violation of 18 U.S.C. §§ 1962(a), (b), (c), and (d); that Defendants committed fraud, unjust enrichment, interference with business relationships, breach of fiduciary duty, and other wrongful acts as determined by the Court; that Plaintiff retains legal ownership of membership interests in the subject entities, including GSSTB, SSL, and others, even though said entities no longer possess operating assets due to Defendants' fraudulent conveyances; that SSP retains certain accounts receivable but no longer holds the property that was jointly acquired and improved; and that Plaintiff is entitled to recover compensatory, treble, and punitive damages, restitution, and equitable relief under applicable federal law and as justice requires.

## D. COSTS AND ATTORNEYS' FEES

Plaintiff seeks recovery of all reasonable attorneys' fees, expert costs, and litigation expenses pursuant to 18 U.S.C. § 1964(c) and any other applicable law, including:

1. Fees and costs incurred in connection with this action, including legal fees, forensic accounting, and expert testimony;

2. Fees incurred in prior or parallel litigation necessitated by Defendants' fraudulent conduct, including but not limited to enforcement actions, emergency injunctions, arbitration, and defense of derivative or retaliatory claims. Plaintiff has incurred not less than $200,000 (two hundred thousand dollars) in legal expenses directly attributable to Defendants' misconduct prior to this case;

**E. FURTHER RELIEF**

Plaintiff requests such other and further relief as the Court deems just, equitable, and appropriate, including equitable restitution, disgorgement, injunctive relief, and any other remedies necessary to prevent ongoing or future misconduct.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims so triable under Rule 38 of the Federal Rules of Civil Procedure.

Dated: January ___, 2026

Respectfully submitted,

/s/Drew Corbin
Drew Corbin, Esq.

Florida Bar No. 1019183
6307 Staunton Drive
Holiday, Florida 34690
Telephone: (727) 510-8615
Email: Pleadings@CorbinLawGroup.com

ATTORNEY FOR PLAINTIFF
UPSTATE HOLDINGS, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of January, 2026, I electronically filed the foregoing

Complaint with the Clerk of the Court using the CM/ECF system, which will send notice of such

filing to all counsel of record who are registered CM/ECF users.

/s/Drew Corbin
Drew Corbin, Esq.
Florida Bar No. 1019183

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF

FLORIDA, TAMPA DIVISION


UPSTATE HOLDINGS, LLC,

Plaintiff,

v.

David J. Heil, et al.,

Defendants.

_____/

APPENDIX A – PREDICATE ACTS BY DEFENDANT

Defendant names correspond to those listed in the Complaint. Numerical designations are

omitted here for clarity and ease of reference. This Appendix provides a non-exclusive

summary of certain predicate acts committed by each named Defendant, as alleged in the

Complaint, for purposes of 18 U.S.C. §§ 1961(1) and 1962. Each Defendant is alleged to

have committed, or aided and abetted in the commission of, at least two qualifying

predicate acts of racketeering activity.

Each predicate act identified herein was committed as part of a scheme to defraud

Plaintiff of money, property, or lawful economic interests and involved the use of

interstate wires, interstate financial institutions, or interstate transactions affecting

interstate commerce. Plaintiff expressly incorporates by reference all racketeering acts,

schemes, overt acts, and related conduct alleged elsewhere in the Complaint, whether or

not specifically enumerated in this Appendix. Nothing herein shall be construed to limit

Plaintiff's proof of additional predicate acts, alternative statutory predicates arising from

the same conduct, or acts discovered through discovery. Paragraph references are to the Factual Background section of the Complaint unless otherwise noted.

Defendant: DHV Ventures, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - Authorized and directed the issuance of insider loan transfers from State Storage Palmetto to affiliated entities under its control. (¶80-81; Exhibit A,N).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) - Received and reinvested enterprise proceeds through structured transactions designed to obscure the source and ownership of misappropriated funds. (¶80-84; Exhibits A,N,N2,N3,N4).

Defendant: ANG Equity Holdings, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - Knowingly participated in and authorized self-dealing insider loan transactions by electronically executing and ratifying a $1,500,000 (one million five hundred thousand dollar) promissory note and related disbursements that falsely characterized insider diversions as legitimate loans, without disclosure to Plaintiff, in furtherance of a scheme to divert enterprise funds. (¶80-81; Exhibits A,N).

2. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) - Used interstate electronic communications and banking facilities originating from Texas to promote and facilitate insider loan transactions and related fund transfers involving enterprise funds held by Florida-based entities, as part of the racketeering scheme. (¶80-81; Exhibits A, N, X).

Defendant: Gator State Storage WPB, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - Acted as managing member and authorized insider loan transactions as borrower entity, including the $500,000.00 loan from State Storage Palmetto, with knowledge of the self-dealing nature and exclusion of Plaintiff. (¶80-81; Exhibits A, N3).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) - Facilitated the cycling and use of misappropriated funds by accepting and deploying insider loan proceeds through affiliated entities to obscure origin, control, and Plaintiff's rightful equity position. (¶80-81; Exhibits A, N3).

Defendant: Cohen Capital, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - Participated in insider loan transactions as managing member of affiliated borrower entities, including by signing and

electronically transmitting promissory notes with knowledge of the exclusionary and self-dealing structure. (¶80-81; Exhibits A, N2).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) - Assisted in the transfer and reinvestment of misappropriated enterprise funds by approving and receiving insider loan proceeds through affiliated borrower entities, with intent to conceal the source and control of assets. (¶80-81; Exhibits A, N2).

Defendant: CGV Holdings, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - Knowingly executed and transmitted fraudulent loan documents by electronic means, including electronically signing a $250,000 promissory note that falsely characterized insider diversions as legitimate loans and concealed self-dealing, which were transmitted through interstate wire communications to induce and justify the transfer of enterprise funds. (¶80-81; Exhibits A, N4).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) - Aided in the transfer and integration of misappropriated enterprise funds by receiving and deploying insider loan proceeds through affiliated entities to conceal origin and retain control within the enterprise. (¶80-81, ¶84; Exhibits A, N4).

Defendant: Texas Built, LLC

Predicate Acts:

1. Conspiracy to Commit Racketeering (18 U.S.C. § 1962(d)) - Participated in the acquisition of enterprise-owned Lubbock properties at below-market value with knowledge of ongoing misconduct by Heil. (¶76, ¶78; Exhibits P, V).

2. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) - Defendants used interstate banking and electronic communications between Minnesota, Utah, and Texas to promote, manage, and complete the lease and acquisition of enterprise-owned Lubbock properties as part of the racketeering scheme. (¶76, ¶78; Exhibits P, V).

Defendant: Gator State Storage Boynton Beach, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) – Received insider loan proceeds from State Storage Palmetto as part of a self-dealing financial transaction drafted and authorized by David J. Heil, with knowledge of its improper purpose. (¶80-81; Exhibits A, N2).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) – Retained and deployed misappropriated funds through affiliated entities to further conceal their origin and control, with the purpose of obstructing Plaintiff's economic interest. (¶80-81; Exhibits A, N2).

3. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) - Defendants used interstate electronic communications and banking facilities originating from Minnesota and Arizona to direct and execute transfers of funds to Florida-based

entities in connection with three Florida properties, including the promotion and facilitation of sham insider loan transactions that furthered the racketeering scheme. (¶80-81; Exhibits A, N2).

Defendant: Gator State Storage Haverhill, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) – Knowingly participated in a scheme to defraud by executing and transmitting self-dealing loan documents by electronic means, including electronically signing promissory notes that falsely characterized insider diversions as legitimate loans, and by receiving insider loan proceeds from State Storage Palmetto with knowledge of the exclusionary and fraudulent purpose of the transactions. These communications and transfers were transmitted through interstate wire channels to induce and justify the diversion of enterprise funds. (¶80; Exhibits A, N2).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) - Accepted, retained, and funneled misappropriated enterprise funds through internal channels and affiliated entities in order to conceal the source, ownership, and control of proceeds derived from wire fraud. (¶80; Exhibits A, N2).

Defendant: Gator State Storage Lake Worth, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) – Knowingly participated in a scheme to defraud by executing and transmitting self-dealing loan documents by electronic means, including electronically signing promissory notes that falsely characterized insider diversions as legitimate loans, and by accepting and using insider loan proceeds authorized by David J. Heil to redirect enterprise value and exclude Plaintiff. These communications and transfers were transmitted through interstate wire channels to induce and justify the diversion of enterprise funds. (¶80,¶84; Exhibits A, N4).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) – Knowingly assisted in concealing the proceeds of wire fraud by acting as a recipient, conduit, and user of misappropriated enterprise funds, thereby obscuring the source, ownership, and control of the illicit proceeds through affiliated entities. (¶80,¶84; Exhibits A, N4).

Defendant: Utah Built, LLC

Predicate Acts:

1. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) – Received at least $1,500,000 (one million five hundred thousand dollars) in diverted enterprise funds originating from Florida based entity State Storage Palmetto, LLC, which were used to finance the acquisition and debt stabilization of Cedar City Shops and Cedar City Storage in Utah. These transfers were executed across state lines using wire channels and were part of a broader scheme to remove control and

value from Plaintiff's reach by relocating assets under affiliated entities in other states without proper disclosure or authorization. (¶80-83; Exhibits A, N2).

2. Wire Fraud (18 U.S.C. § 1343) – Benefited from electronic transfers of misappropriated funds originating from enterprise-controlled accounts in Florida, which were sent via interstate wires to facilitate the purchase and development of Utah based commercial storage properties. These transfers were made without Plaintiff's knowledge or approval and were intended to exclude him from equity participation and financial upside. (¶80-81; Exhibits A, N2).

3. Money Laundering (18 U.S.C. §§ 1956, 1957) – Participated in the laundering of misappropriated enterprise funds by accepting and integrating illicit capital into real estate transactions. The structuring of these investments was designed to conceal the origin of funds, obscure Plaintiff's rightful stake, and enrich enterprise insiders. (¶80-83; Exhibits A, N2).

Defendant: State Storage Southwest, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - Knowingly executed and transmitted fraudulent loan documents by electronic means, including electronically signing promissory notes that falsely characterized insider diversions as legitimate loans and concealed self-dealing, which were transmitted through interstate wire communications to induce and justify the transfer of enterprise funds. (¶80-83; Exhibit N).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) – Accepted and integrated proceeds of wire fraud into real estate transactions, including financing Cedar City Shops and Cedar City Storage with insider loan proceeds, to conceal the source, ownership, and control of misappropriated enterprise funds. (¶80-83; Exhibits A, N).

3. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) - Used interstate electronic communications and banking facilities to promote and facilitate insider loan transactions and related fund transfers between out-of-state actors and Florida-based entities as part of the racketeering scheme. (¶80-83; Exhibits A, N).

Defendant: State Storage Palmetto, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) – Issued five self-dealing loan transfers to affiliated entities without proper authorization, in furtherance of a scheme to divert enterprise funds from Plaintiff. (¶80; Exhibits A,N,N2,N3,N4).

2. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) – Used interstate electronic communications and banking facilities originating from Texas and Minnesota to direct and execute transfers of enterprise funds held by Florida-based entity State Storage Palmetto, LLC, in order to promote and carry out the racketeering scheme. (¶80; Exhibits A,N,N2,N3,N4).

3. Conspiracy to Commit Racketeering (18 U.S.C. § 1962(d)) - Knowingly agreed and conspired with David J. Heil and other enterprise members to conduct and

participate in the enterprise's affairs through a pattern of racketeering activity, including wire fraud and interstate facilities violations, by coordinating and approving self-dealing insider loan transactions that diverted enterprise funds and excluded Plaintiff. (¶ 80; Exhibits. A,N,N2,N3,N4).

Defendant: David J. Heil

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) – Knowingly executed a scheme to defraud by directing and causing multiple electronic transfers of enterprise funds from company accounts to his personal account without disclosure or authorization, using interstate wire communications to misappropriate enterprise assets for personal benefit. The scheme was carried out through a series of electronic transfers occurring on multiple dates. (¶57, ¶65,¶66,¶77; Exhibits M, R, T, U).

2. Bank Fraud (18 U.S.C. § 1344) – Submitted materially false certifications and representations to Synovus Bank concerning the status of litigation and lis pendens affecting enterprise properties, for the purpose of influencing the bank's actions and decisions, while knowing such statements were false. (¶ 69; Exhibit B).

3. Obstruction of Justice (18 U.S.C. §§ 1503, 1512) – Knowingly provided false sworn testimony during arbitration proceedings, concealed material appraisal evidence, and caused the deletion of enterprise email accounts and related internal records during a period in which arbitration and litigation were reasonably

foreseeable, with the intent to obstruct, influence, and impede the due administration of justice. (¶58, ¶70; Exhibits J, O, Y).

4. Money Laundering (18 U.S.C. §§ 1956, 1957) – Conducted and attempted to conduct financial transactions involving the proceeds of wire fraud by transferring and reinvesting diverted enterprise funds through DHV Ventures and affiliated entities, knowing the funds were derived from unlawful activity and with intent to conceal their source, ownership, and control. (¶81-82; Exhibits A,N,N2,N3,N4).

5. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) - While operating from Minnesota, David J. Heil used interstate electronic communications and banking facilities to direct and control financial transactions and enterprise activities involving banks and properties located in Texas, Florida, and Utah, in order to promote, manage, and carry out the racketeering scheme. (¶57, ¶65,¶66,¶77,¶81-84; Exhibits A, M, R, T, U).

6. Extortion (18 U.S.C. § 1951) - Knowingly attempted to obtain property and intangible economic rights from Plaintiff by wrongful use of threats and coercive communications, including demands that Plaintiff relinquish ownership interests and legal rights under threat of financial harm and continued exclusion, as reflected in written communications transmitted in interstate commerce. (¶74, ¶109; Exhibit Z).

Defendant: Nick Good

Predicate Acts:

1. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) - Used interstate electronic communications and banking facilities originating from Texas to promote and facilitate insider loan transactions and related fund transfers to affiliated entities located in Utah and Florida as part of the racketeering scheme. (¶80-81,¶90-94; Exhibits N, N2, N3, N4).

2. Wire Fraud (18 U.S.C. § 1343) - While residing in Texas, Nick Good knowingly executed and transmitted fraudulent loan documents by electronic means, including electronically signing promissory notes through ANG Equity Holdings that falsely characterized insider diversions as legitimate loans and concealed self-dealing, in order to induce and justify the transfer of enterprise funds to affiliated entities in Utah and Florida. (¶80-81,¶90-94; Exhibits N, N2, N3, N4).

3. Conspiracy to Commit Racketeering (18 U.S.C. § 1962(d)) – Knowingly agreed and conspired with David J. Heil and other enterprise members to conduct and participate in the enterprise's affairs through a pattern of racketeering activity, including wire fraud and interstate facilities violations, by coordinating insider-controlled loan and leaseback transactions that diverted enterprise income and deprived Plaintiff of rightful distributions. (¶80-81,¶90-94; Exhibits N, N2, N3, N4, P, V).

Defendant: Carl Gentile

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - Knowingly participated in the execution and receipt of insider loan proceeds through interstate electronic transfers involving CGV Holdings, with knowledge that the transactions were self dealing, exclusionary, and part of a scheme to divert enterprise funds. (¶14, ¶80, ¶84; Exhibits A, N3, N4).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) - Aided in the transfer, receipt, and integration of proceeds of wire fraud through affiliated entities, including CGV Holdings, with intent to conceal the source, ownership, and control of misappropriated enterprise funds. (¶14, ¶80, ¶84; Exhibits A, N3, N4).

Defendant: Abel Sng

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - As Chief Financial Officer, Abel Sng knowingly approved and executed fraudulent insider loan transactions by electronic means through State Storage Southwest, including the $1.500,000 loan to Utah Built LLC, falsely characterizing self-dealing transfers as legitimate loans in furtherance of a scheme to divert enterprise funds and exclude Plaintiff. (¶80-83; Exhibits A, N).

2. Interstate Facilities in Aid of Racketeering (18 U.S.C. § 1952) - While operating from Texas, used interstate electronic communications and banking facilities to promote, approve, and facilitate insider loan transactions and related fund

transfers involving enterprise properties and entities located in Utah and Florida as part of the racketeering scheme. (¶80-83; Exhibits A, N).

3. Money Laundering (18 U.S.C. §§ 1956, 1957) - Assisted in the transfer, reinvestment, and concealment of proceeds of wire fraud through structured intra-entity transactions, including the use of diverted funds in Utah property acquisitions, with intent to conceal the source, ownership, and control of misappropriated enterprise funds. (¶80-83; Exhibits A, N).


Defendant: James Wait

Predicate Acts:

1. Conspiracy to Commit Racketeering (18 U.S.C. § 1962(d)) - Knowingly agreed and conspired with David J. Heil and other members of the enterprise to conduct and participate in the enterprise's affairs through a pattern of racketeering activity, including wire fraud and diversion of enterprise funds, as evidenced by coordinated planning communications reflecting knowledge of and agreement with the scheme to exclude Plaintiff and misappropriate enterprise value. ( ¶54, ¶111; Exhibit X).

2. Wire Fraud (18 U.S.C. § 1343) - Used and caused the use of interstate electronic communications in furtherance of the scheme by transmitting and coordinating deceptive communications designed to facilitate diversion of enterprise funds, conceal the true nature of insider transactions, and exclude Plaintiff from ownership benefits. ( ¶54, ¶111; Exhibit X).

Defendant: David W. Heil

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) - As Chief Operating Officer of State Storage Group, David W. Heil knowingly authorized, approved, and facilitated interstate electronic transfers of enterprise funds from company accounts to accounts controlled by insiders, with knowledge that the transfers were self-dealing, unauthorized, and part of a scheme to misappropriate enterprise assets. (¶80; Exhibits A, W).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) - Knowingly participated in financial transactions involving the proceeds of wire fraud by reinvesting diverted enterprise funds through DHV Ventures and affiliated entities, with intent to conceal the source, ownership, and control of illicit proceeds, and to legitimize insider misappropriation through affiliated structures. (¶13, ¶80-84; Exhibits A, W).

3. Conspiracy to Commit Racketeering (18 U.S.C. § 1962(d)) - As C.O.O. and equity participant in entities central to the enterprise, knowingly agreed and conspired with David J. Heil and others to conduct and participate in the enterprise's affairs through a pattern of racketeering activity by authorizing insider financial transactions designed to exclude Plaintiff and divert enterprise funds for insider benefit. (¶13, ¶80-84; Exhibits A, W).

Defendant: Justin Cohen

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) – Knowingly participated in and caused the execution and receipt of insider loan proceeds through interstate electronic transfers from State Storage Palmetto to affiliated entities, including Gator State Storage Boynton Beach, with knowledge that the transactions were self-dealing, exclusionary, and part of a scheme to divert enterprise funds. (¶15,¶17, ¶80; Exhibits A, N2).

2. Money Laundering (18 U.S.C. §§ 1956, 1957) – Knowingly conducted financial transactions involving the proceeds of wire fraud by retaining, transferring, and reinvesting misappropriated enterprise funds through affiliated entities, with intent to conceal the source, ownership, and control of the proceeds. (¶15,¶17, ¶80, ¶84; Exhibits A, N2).

Defendant: State Storage Group, LLC

Predicate Acts:

1. Wire Fraud (18 U.S.C. § 1343) – Acting through its controlling member David J. Heil, State Storage Group, LLC knowingly authorized, executed, and ratified interstate electronic transfers of enterprise funds through self-dealing loan structures, below-market asset transfers, and insider-directed disbursements that falsely characterized the transactions as legitimate and were designed to exclude

Plaintiff from ownership benefits and misappropriate enterprise proceeds. (¶74, ¶80-81; Exhibits A, N, N2, N3, N4).

2.  Money Laundering (18 U.S.C. §§ 1956, 1957) – Knowingly participated in financial transactions involving the proceeds of wire fraud by transferring, concealing, and reinvesting misappropriated enterprise funds through affiliated entities, including DHV Ventures LLC, Texas Built LLC, and Utah Built LLC, with intent to obscure the source, ownership, and control of the proceeds. (¶80-81; Exhibits A, N, V).

3.  Conspiracy to Commit Racketeering (18 U.S.C. § 1962(d)) – Knowingly agreed and conspired with David J. Heil, James Wait, and other members of the enterprise to conduct and participate in the enterprise's affairs through a pattern of racketeering activity by authorizing coordinated exclusion of Plaintiff, approving insider loan structures, facilitating asset transfers to affiliated entities, and acting in concert to misappropriate enterprise assets and frustrate Plaintiff's recovery. (¶80-86, ¶88-94; Exhibits A, X).